IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARY KAREN ERBE,                                )
Executrix of the Estate of Edward Erbe,         )
                                                )
        Plaintiff,                              )          Civil Action No. 06-113
                                                )
                v.                              )          Judge Terrence F. McVerry
                                                )          Magistrate Judge Lisa Pupo Lenihan
CONNECTICUT GENERAL LIFE                        )
INSURANCE COMPANY,                              )          Doc. Nos. 65, 69
                                                )
        Defendant.                              )
                                                )

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that Plaintiff's Motion for Summary Judgment (Doc. No. 69) be denied and that Defendant's Motion for Summary Judgment (Doc. No. 65) be granted.

### II. REPORT

Currently before the Court for disposition are cross-motions for summary judgment in this ERISA action brought under 29 U.S.C. § 1132(a)(1)(B) for review of a denial of benefits. The sole issue before the Court is whether, under a *de novo* standard of review, Defendant properly denied Plaintiff's claim for accidental death and dismemberment benefits.

#### A.        Statement of Relevant Facts and Procedural History

At the time of his death on July 21, 2003, Edward Erbe was a 57-year old lubrication engineer who had been employed by Exxon Mobil Corporation for 34 years. As a lubrication engineer, Mr. Erbe was responsible for troubleshooting and performing inspections at different sites and making recommendations. In addition, Mr. Erbe advised customers on the proper lubricants to

use with various machinery, provided support for sales representatives, and trained other lubrication specialists and engineers.   Mr. Erbe maintained a home office where he performed some of his responsibilities.   (R. 105, 137-38.)[1]

Mr. Erbe's medical history reveals that on March 13, 1997, he sought medical attention at Latrobe Area Hospital for complaints of chest pain. (R. 213.) After conducting a series of tests, Mr. Erbe was discharged after one day with the conclusion that his chest pain was non-cardiac in nature. (R. 214.)   It was documented during this hospitalization that Mr. Erbe was a heavy smoker of 2 to 3 packs of cigarettes a day for 20 years.[2]  (*Id.*) Upon his discharge, Mr. Erbe was instructed to follow-up with his family physician and to stop smoking.  (*Id.*) Mr. Erbe's past medical history also consisted of some gastro-intestinal problems in 1998 and 2001.  (*Id.*)   Although his cholesterol was reported as elevated in 1992 and 1995 (R. 217), Mr. Erbe was not taking any medication at the time of his death other than daily aspirin (R. 140, 144).   Also, according to Mrs. Erbe, her husband was never diagnosed with high blood pressure. (R. 144.)   Mr. Erbe underwent yearly check-ups with his family physician of 20 years, and at no point during this time was he under the regular care of a cardiologist. (R. 134, 136.)  Also, Mr. Erbe underwent biannual physical examinations through Exxon Mobil, which sometimes included a stress test.   (R. 141.)[3]  After reviewing the entire administrative record, the Court could not find any notation of a cardiac problem or the diagnosis

---

[1] All references are to the Administrative Record stipulated to by the parties and filed at Doc. No. 68.

[2] Mrs. Erbe questioned whether her husband's actual daily smoking was as high as previously reported, as her husband did not smoke in the house, and he could not smoke while on the job or in motel rooms when he traveled.  (R. 142.)

[3] However, the corporate records of Mr. Erbe's physical examinations, and thus the results of the stress tests, are not contained in the administrative record.

of such problem with regard to Mr. Erbe prior to his fatal heart attack on July 23, 2001.

On the date of his death, Mr. Erbe left his home and picked up his co-worker, Greg Sadowski, at 8:45 a.m., and together they traveled to U.S. Steel Corporation's Mon Valley Works to inspect the gears of the machinery in the "hot mill" section of the plant, which is where the steel is actually produced.  (R. 157-58.) In anticipation of the inspection, the hot mill operation had been shut down at 8:30 a.m. (R. 158, 173.)  Ninety minutes later, heat continued to emanate from the gear boxes that Mr. Erbe and Mr. Sadowski were about to inspect.  (173-74.)

Mr. Erbe and Mr. Sadowski arrived at the hot mill around 9:30 a.m. and prior to commencing their inspection, dressed in protective coveralls which they wore over their work clothes, as well as gloves, safety boots, safety glasses, and hard hats.  (R. 159, 163-64.)  The coveralls, which were provided by the plant, were a type of fire-resistant, plastic suit.  (R. 163.)  The inspection began at 10:00 a.m. and lasted approximately two and one-half hours.  (R. 167, 173.)  During the course of the inspection, Mr. Erbe and Mr. Sadowski inspected 13 or 14 mill stands.  (R. 161.)  In order to inspect the condition of the gears, it was necessary to look through the inspection port, which required climbing either one or two plates, each approximately one foot in height, for a side view, or a ladder to view a top portal. (R. 161-62, 173.)  Mr. Erbe acted more as a mentor during the inspection; Mr. Sadowski did a lot of the inspection and physical labor, and if he discovered something that did not look right, he asked Mr. Erbe for his opinion, to double check his work.  (R. 162-63, 195, 204-06.)  Mr. Sadowski recalled that there were only two top portals and he did not recall Mr. Erbe climbing on those two.   (R. 195, 204.)  However, Mr. Erbe accompanied Mr. Sadowski to each of the gear boxes, which required Mr. Erbe to work his way around each mill stand, *i.e.,* climbing steps, walking across the mezzanine and coming down to the next stand.  (R.

163, 204-06.)

On two separate occasions, Mr. Sadowski estimated the temperature in the "hot mill" section to be between 90 and 100 degrees Fahrenheit (R. 200), and between 85 and 95 degrees (R. 164). The combination of the coveralls and the temperature caused both men to "sweat profusely literally drenching [their] clothing." (R. 164-65, 185.) They took several breaks during the inspection where they would sit and consume a Gatorade type drink for five to ten minutes. (R. 165.) On one or two of these breaks, the men were able to sit in an air-conditioned room. (R. 166.) Mr. Erbe did not complain of any chest pains or other problems during the inspection. (R. 166, 188.) Also, Mr. Sadowski noted that Mr. Erbe smoked during the inspection but could not recall the number of cigarettes he smoked. (R. 174-75.)

After the inspection was completed, while Mr. Sadowski was reviewing the results of the inspection with the maintenance staff, Mr. Erbe complained that he was not feeling well and was rubbing his chest. (R. 168-69.) Mr. Sadowski stated that both of them were very tired after the inspection as it had been a tough day, meaning that they felt pretty well drained from working in those temperatures. (R. 169.) Mr. Erbe did not make any such complaints to Mr. Sadowski on the drive to the plant earlier that day. (R. 175, 188.) Mr. Erbe and Mr. Sadowski left the plant between 12:30 p.m. and 1:00 p.m., with Mr. Erbe doing the driving. (R. 177-79.) They stopped at a mini-mart to purchase a couple of Gatorades, and while Mr. Sadowski was inside the mini-mart, Mr. Erbe moved to the passenger side of the vehicle. (R. 179-80.) When he returned to the vehicle, Mr. Sadowski took over the driving and shortly thereafter, he again asked Mr. Erbe how he was feeling, to which Erbe responded that he was having chest pains. (R. 183.) At that point, Mr. Sadowski told Mr. Erbe he was taking him to the hospital. (*Id.*) However, when Mr. Sadowski glanced over at Mr.

Erbe, he was already gone.  (R. 190-91.)  Mr. Erbe's fatal heart attack occurred within approximately ten to fifteen minutes after leaving the plant.  (R. 181.)  Mr. Erbe was taken to UPMC McKeesport by ambulance where he was diagnosed as a cardiac arrest.  (R. 239.)

The Certificate of Death completed on July 22, 2003 lists "Arteriosclerotic Cardiovascular Disease" as the cause of death and the manner of death as "natural.".  (R. 312.)  In addition, the Autopsy Report of that same date determined the cause of death to be Arteriosclerotic Cardiovascular Disease and the manner of death was "natural."  (R. 277.)  With regard to the cardiovascular system, the Autopsy Report stated that the main left coronary artery was markedly calcified and was 90% blocked.  (R. 283.)  The Autopsy Report further indicated that the left anterior descending coronary artery appeared severely calcified and was 90% blocked.  (*Id.*)  Also, the right coronary artery was calcified and was 50% blocked.  (*Id.*)  In addition, the aorta showed mild to moderate atherosclerosis, with no ulcerated plaques.  (R. 284.)

Subsequently, on or about September 24, 2003, Plaintiff, Mary Karen Erbe, the spouse and executrix of the estate of Edward Erbe, submitted a claim for benefits under the Basic Accidental Death and Dismemberment Insurance Group Policy No. 2044589 ("Policy") provided by Exxon Mobile and issued by Defendant, Connecticut General Life Insurance Company ("CGLIC"), based on her belief that Mr. Erbe died as a result of an accident on the job.[4]  (R.  310, 313.)

The Policy provides in relevant part that CGLIC will pay the benefit amount for any "accident" when CGLIC receives proof that the insured received an "accidental bodily injury" and died "as a direct result of the injury, independent of all other causes."  (R. 57.)  The Policy further

---

[4]Plaintiff also filed a claim for life insurance benefits under Exxon Mobile's Basic Life Insurance Group Policy and received proceeds in the amount of $157,518.00.  (R. 298-300.)

provides that CGLIC "will pay the benefit amount for an accident related to work when it receives due proof that: [(1)] the injury arose out of and in the course of employment by Exxon Mobil Corporation; and [(2)] the injury was one which would Warrant Worker's Compensation." (R. 57.) If CGLIC does not receive proof that the injury arose out of and in the course of the insured's employment and was one which would be covered by workers' compensation, the Policy provides that CGLIC will pay the benefit amount for an accident not related to work. (*Id.*) The Schedule contained in the Policy states that if an accidental death is determined to be related to the insured's work, the benefit equals two times the insured's annual normal pay plus $250,000.00; if not related to work, the benefit equals two times the insured's annual normal pay. (R. 55.) The administrative record also contains a Certificate Rider applicable to the AD&D Policy which purportedly changed the benefit amount payable for an accident related to work to two times the insured's annual normal pay plus $500,000.00, effective February 1, 2002. (R. 46-47.)[5]

The Policy also contains a list of exclusions, none of which apply here. (R. 59.) Notably absent from the Policy is an exclusion for death resulting from sickness or disease. The Policy does not define the terms "accident," "injury," or "occupational accidental death." Finally, the Policy provides that the "entire contract will be made up of the policy, the application of the Policyholder, . . . and the applications, if any, of the Employees." (R. 77.)

With regard to Basic AD&D Insurance Coverage, the Summary Plan Description ("SPD") states in relevant part: "Q. What happens if I die or am injured in an accident? A. The plan provides benefits for accidental death and certain accident-related injuries. The benefit amount depends on a number of factors, including whether the accident is work-related. . . . If you die in a

---

[5]The parties appear to dispute whether the Certificate Rider was actually adopted.

work-related accident, your beneficiary receives an additional $250,000." (R. 13-14.)   The SPD

also contains some restrictions to Basis AD&D Insurance.  (R. 14.)  In this regard, the SPD states

that benefits may be denied if death or injury results from certain enumerated acts, none of which

includes sickness or disease.  (*Id.*)  In addition, the SPD provides definitions of the terms "accident,"

"injury," and "occupational accidental death."  (R. 42-43.)  In the SPD, an "accident" is defined as

a "sudden, violent, unexpected, external incident."  (R. 42.)  "Injury" is defined in the SPD as

"[b]odily injury caused directly and exclusively by a sudden, violent, unexpected, external accident."

(R. 43.)  The SPD defines "occupational accidental death" as:

> An injury to the body resulting in death of the covered person that is:
>
> • Caused directly and exclusively by a sudden, violent, unexpected, external accident;
> • Incurred in the course and scope of the covered employee's employment with ExxonMobil; and
> • Compensable under the workers' compensation law applicable to the covered employee, or if no workers' compensation law is applicable, would be compensable under New Jersey workers' compensation law (Delaware workers' compensation law in the case of ocean and inland waterways seamen of SeaRiver Maritime, Inc.) if such law had been applicable.

(*Id.*)  In addition, the SPD contains the following disclaimer: "This booklet is a summary.  It does

not contain all plan details.  In determining specific benefits, the full provisions of formal plan

documents and the insurance certificates, as they exist now or as they may exist in the future, always

govern. . . ."  (R. 3.)

CGLIC initially denied Plaintiff's claim for AD&D benefits on January 23, 2004, on the

basis of the Autopsy Report and Certificate of Death, which showed that Mr. Erbe died of natural

causes, *i.e.,* arteriosclerotic cardiovascular disease, and not as a result of an "accidental bodily

injury" as required under the Policy.  (R. 258-260.)  In support of its denial, CGLIC proffered the

follwing explanation:

> This policy, as quoted previously, will only pay the benefit Amount
> when it received due proof that as a direct result of accidental bodily
> injury, independently of all other causes an insured sustained a
> covered loss.  Mr. Erbe's cause of death is listed as arteriosclerotic
> cardiovascular disease.  Since Mr. Erbe's death was no [sic] the
> direct result of accidental bodily injury, independently of all other
> causes but rather caused by his health conditions we have determined
> that the policy provision regarding sickness would apply and no
> accidental death benefits are payable under the provisions of policy
> 2044589.

(R. 259.)  Plaintiff filed an appeal on February 13, 2004, arguing through her counsel that Mr. Erbe

died as a result of restrictive clothing he had to wear while inspecting the hot mill plant, and that the

heat and dehydration suffered by Mr. Erbe brought on an underlying heart condition which caused

his death.  (R. 256-57.)

On  June 7, 2004, Plaintiff's counsel sent a letter to CGLIC requesting that CGLIC await the

outcome of the workers' compensation case before making a determination on Plaintiff's claim for

AD&D benefits.  (R. 228.)  In addition, Plaintiff's counsel raised an objection to CGLIC's initial

decision which purportedly utilized the incorrect Policy provision–"accident related to work–and

failed to evaluate Plaintiff's claim under the "any accident" section as well.  (R. 228-29.)  Finally,

Plaintiff's counsel requested copies of all plan documents and all other documents relating to the

investigation and denial of Plaintiff's claim.  (R. 229.)  In response, on June 28, 2004, CGLIC

agreed to put its decision in abeyance pending the outcome of the workers' compensation case and

provided the requested documents.[6]  (R. 227.)

---

[6]CGLIC also responded that it would address Plaintiff's counsel's objection relating to the
"accident related to work" section at the time of its decision on the claim appeal.  (R. 227.)

On or about April 1, 2005, Plaintiff's counsel informed CGLIC through written correspondence that Exxon Mobil, which initially opposed the fatal claim petition, had agreed to pay the claim, and provided copies of the evidence submitted in the workers' compensation case, including hearing testimony from Mrs. Erbe and Mr. Sadowski, case law relevant to the worker's compensation petition, and the expert report of Dr. Cyril Wecht, whom Plaintiff retained to provide an expert opinion in the workers' compensation case.  (R. 123-24, 126.)  Plaintiff's counsel renewed his request for payment of AD&D benefits based on this evidence.  (R. 123-26.)

The report from Dr. Wecht dated November 23, 2004, opined, in relevant part:

> Acute myocardial infarction is the rapid myocardial necrosis caused by a critical imbalance between the oxygen supply and demand of the myocardium.  The increased demand for oxygen by the myocardium during the severely strenuous activity under adversely hot environmental conditions directly caused the imbalance in oxygen supply to the heart muscle.  Mr. Erbe's fatal acute myocardial ischemia was the direct result of his job-related activity on the day of his collapse.
>
> . . .
>
> Following the review of all available documents, including the results of the autopsy, based upon a reasonable degree of medical certainty, it is my professional opinion that Mr. Edward Erbe died from acute myocardial ischemia.  The severe left coronary atherosclerosis with 90% luminal occlusion and the 50% occlusion of the right coronary artery could not provide the markedly increased oxygen demand by the myocardium that was produced by the extreme physical exertion, aggravated by a very hot environmental condition.
>
> Mr. Edward Erbe's death was job-related for the above stated reasons.

(R. 218-19.)

Plaintiff's counsel again corresponded with CGLIC on June 2, 2005, enclosing a two-page document reflecting that Exxon Mobil agreed to pay the workers' compensation claim.  (R. 113-15.)

9

On July 8, 2005, Plaintiff's counsel provided  a copy of the Final Decision of the judge in the workers' compensation case to CGLIC.  (R. 109-112.)

On August 11, 2005, after reviewing the additional evidence provided by Plaintiff, the SPD, and the previous evidence considered, CGLIC issued its final determination maintaining its denial of  Plaintiff's claim.  (R. 103-06.)  CGLIC's proffered explanation was as follows:

> Having reviewed the available records, there is no indication that Mr. Erbe's death on July 21, 2003 was the result of accidental bodily injury.  The Medical Examiner completed the Death Certificate which indicates Mr. Erbe's death was the result of Arteriosclerotic Cardiovascular Disease.  The manner of death was ruled as natural. There is no evidence that an accident occurred based upon the provisions above and that Mr. Erbe's death was a result of any accidental bodily injuries.  Therefore, it does not appear that there was a sudden, violent, unexpected external event which caused Mr.Erbe's death, as required.
>
> Furthermore, the Worker's Compensation hearing indicates that Mr. Erbe was undertaking the duties of his usual job and performing in his usual manner on the date of his death.   There was no documentation included in this hearing which identified any sudden, violent, unexpected event.
>
> The Basic Accidental Death Insurance and Occupational Accidental Death Insurance only pays benefits for loss from bodily injuries caused by an accident, and thus we have determined that no accidental death benefits are payable under the provisions of policy #2044589.

(R. 106.)  Plaintiff subsequently appealed CGLIC's final determination by commencing the instant lawsuit in state court, which was timely removed to this Court on January 27, 2006.

The parties have filed cross-motions for summary judgment on the propriety of CGLIC's denial of Mrs. Erbe's claim for AD&D benefits under the Policy.  The motions have been fully briefed and are now ripe for review.

### B.    Standard of Review - Cross-Motions for Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same. *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D.Pa. 2006). "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x. 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be

entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing *Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3d Cir. 1998)).

**C.**     **Standard for Reviewing Erbe's Benefit Determination**

The parties previously filed cross-motions for partial summary judgment on the issue of the appropriate standard of review of CGLIC's benefit determination.  (*See* Doc. Nos. 49 & 52.)  After considering the parties' arguments, the Court determined that the Policy did not contain either an express or implied delegation of discretionary authority to CGLIC, and therefore, the *de novo* standard of review applied to the review of CGLIC's denial of AD&D benefits.  *See* Memorandum Opinion and Order dated March 9, 2009 (Doc. No. 63).  Accordingly, the Court will apply a *de novo* standard of review to CGLIC's denial of Mrs. Erbe's claim for AD&D benefits.

*De novo* review "'means here, *as it ordinarily does,* [that] . . . the court's inquiry is not limited to or constricted by the . . . record, nor is any deference due the . . . conclusion [under review].'" *Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d 1176, 1184 (3d Cir. 1991) (quoting *Doe v. United States,* 821 F.2d 694, 697 (D.C. Cir. 1987)(emphasis added)).  Thus, "[i]f the record on review is sufficiently developed, the district court may, in it discretion, merely conduct a *de novo* review of the record of the administrator's decision, making its own independent benefit determination."  *Id.* at 1185 (footnote and citation omitted).

**D.**     **Analysis**

In support of its motion for summary judgment, CGLIC submits that in order to be entitled to AD&D benefits under the Policy, there must have been an "accident" that caused an "accidental bodily injury" and the decedent must have died "as a direct result of the injury, independent of all other causes."   According to CGLIC, it is undisputed that Mr. Erbe had arteriosclerotic

cardiovascular disease and died of a heart attack while riding as a passenger in a car on the way home from performing his normal job duties.  In addition, CGLIC contends that there is no evidence in the administrative record of any sudden or unexpected, violent, external event that affected Mr. Erbe prior to his death.    Thus, CGLIC maintains that Mr. Erbe did not die as a result of an "accident" and did not receive any "accidental bodily injury."  Accordingly, CGLIC contends it properly denied Plaintiff's claim for AD&D benefits and thus, is entitled to summary judgment in its favor.

On the other hand, in support of her summary judgment motion, Mrs. Erbe argues that the Policy does not define key terms, such as "accident," and because the Policy included a total integration clause, the Court may not look to the definition of "accident" contained in the SPD.  In such circumstances, Plaintiff argues the Court must apply the federal common law definition for that term.  According to Plaintiff, under either ERISA federal common law or Pennsylvania common law, the term "accident" is defined as "an unexpected or unintentional happening."  When federal common law is applied to the facts here, Plaintiff submits it is clear that Mr. Erbe's injury and death resulted from an accident.  Moreover, Plaintiff contends she is entitled to AD&D benefits as she has demonstrated that her husband's *injury*, independent of other causes, resulted in death.  Under established Third Circuit case law, Plaintiff submits that she must only show that  Mr. Erbe's injury was the moving, proximate cause of his death, not that it was the sole cause. Plaintiff submits that her husband's injury was an acute myocardial necrosis and infarction caused by an imbalance between the oxygen supply and the demand of the myocardium, and such injury was the clear cause of his death. While the myocardial injury was contributed to by Mr. Erbe's underlying condition, the Policy is devoid of any requirement that excludes injuries contributed to by pre-existing

conditions.  In addition, Plaintiff contends her construction of the Policy language is buttressed by the requirement in the Policy that the "injury was one which would Warrant Worker's Compensation."  Thus, Plaintiff contends CGLIC improperly denied her claim for AD&D benefits, and she is thus entitled to summary judgment in her favor.

The Court will address each of these arguments *seriatim*.

### 1.    Consideration of the SPD

The Policy does not define the term "accident."  The SPD does, however, provide the following definition of that term: "a sudden, violent, unexpected, external incident."  Mrs.  Erbe submits that the Court may not consider this definition, as the Policy contains an integration clause, and therefore, the Court must look to federal common law under ERISA to define that term. On the other hand, CGLIC contends that even though the Policy certificate does not define the term "accident,"  the Court may look to the definition of "accident" contained in the SPD, as the SPD is an essential plan document that was drafted contemporaneously with the Policy, and therefore, is part of the plan, despite an integration clause in the Policy limiting what constitutes the contract between the insurer and sponsor.  CGLIC further contends that the definitions in the SPD are a strong indication of the plain meaning of the words in the Policy certificate as understood by the parties.  The Court agrees with CGLIC that it may look to the SPD for the definition of the term "accident," as well as the terms "injury," and "occupational accidental death."

ERISA mandates that employee benefit plans within its purview, such as the AD&D Policy at issue here, "be established and maintained pursuant to a written instrument."  29 U.S.C. § 1102(a)(1).  Additionally, ERISA requires the plan administrator to create a written summary plan description and provide a copy of the SPD to each participant and beneficiary receiving benefits

under the plan. 29 U.S.C. § 1024(b). The SPD must be "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," and it must provide information as to "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(a) & (b). In addition, SPDs "must not have the effect of misleading, misinforming, or failing to inform participants and beneficiaries." 29 C.F.R. § 2520.102-2(b).

The clear weight of authority holds that SPDs are considered part of the ERISA plan documents and should be considered when interpreting an ERISA plan. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co.,* 188 F.3d 130, 135 n.3 (3d Cir. 1999) (citing *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 949 (8th Cir. 1994); *Alday v. Container Corp. of Am.,* 906 F.2d 660, 665 (11th Cir. 1990)); *Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.,* 293 F.3d 1139, 1143 (9th Cir. 2002); *Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1511 & 1515 (10th Cir. 1996); *see also Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan,* 129 S.Ct. 865, 877 (2009) ("It is uncontested that the [savings and investment plan] and the summary plan description are 'documents and instruments governing the plan.'"). Generally, when interpreting the terms of an ERISA plan, courts will examine the plan documents as a whole and, if unambiguous, will construe them as a matter of law. *Chiles,* 95 F.3d at 1505 (citing *Kemmerer V. ICI Americas Inc.,* 70 F.3d 281, 288-89 (3d Cir. 1995)); *Morrison v. Marsh & McLennan Cos., Inc.,* 326 F.Supp.2d 833, 840 (E.D.Mich. 2004) (citing *Wendy's Int'l, Inc. v. Karsko,* 94 F.3d 1010, 1013 (6th Cir. 1996); *Chiles,* 95 F.3d at 1511)(other citations omitted)), *aff'd* 439 F.3d 295 (6th Cir. 2006).

The Court acknowledges that the Policy purports to be an integrated writing. In this regard,

the Policy states that the "entire contract will be made up of the policy, the applications of the Policyholder [Exxon Mobil], . . . and the applications, if any, of the Employees."  Policy at Provisions, Section 40.  (R. 77.)  However, the presence of an integration clause is not necessarily conclusive.  *See Grosz-Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1161 (9ᵗʰ Cir. 2001) (footnote omitted) (noting that "'an integration clause in the written agreement is not necessarily conclusive as to the parties' intent to include their entire agreement in the writing'"); *see also* 1-5 MURRAY ON CONTRACTS § 84 [C][2] & n. 79-81 (2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 216 comments (b) & (e)) (noting that the RESTATEMENT 2D refuses to give conclusive effect to a merger clause).   This is especially true where, such as here, the written instrument containing the explanatory language is the SPD, a central plan document.  Indeed, the creation and distribution of the SPD is mandated by ERISA.  29 U.S.C. § 1022.  Moreover, the statute requires that the SPD contain, in some detail, an explanation of the participants' rights and obligations under the plan, and "be written in a manner calculated to be understood by the average plan participant . . . ."  29 U.S.C. § 1022(a).  This is because "the SPD is the document to which the lay employee is likely to refer in obtaining information about the plan and in making decisions affected by the terms of the plan."  *Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.,* 334 F.3d 365, 379 (3d Cir. 2003).  The Court concludes, therefore, that the SPD is part of the plan, despite the presence of an integration clause in the Policy limiting what constitutes the contract between the insurer and plan sponsor.

Another court from outside this district similarly construed the application of an integration clause in determining which standard of review applied to a denial of benefits under ERISA.  In *Jobe v. Medical Life Insurance Company,* No. 07-4152-CV, 2008 WL 2837998 (W.D. Mo. July 21,

2008),  the court explained:

> [Claimant] argues that the Court should apply the de novo standard of review because the policy contains an "integration clause" that purports to name the policy, the application of the policyholder, the participating employers' applications, and each Employee's application for insurance as the "complete contract." None of these documents grants the administrator discretionary authority. [The insurer], however, argues that the Employee Benefit Booklet, which grants [the insurer] discretionary authority to determine disability, is part of the policy because it serves as the policy's SPD. The Eighth Circuit has held that "SPDs are considered part of the ERISA plan documents." *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 950 (8th Cir.1994) (holding that ERISA plans must be established by a written instrument and that SPDs are part of the written instruments). Because the SPD granted discretionary authority to the plan administrator, the Court reviews the plan administrator's decision under the abuse of discretion standard.

*Id.* at *5.  *See also Admin. Comm. for Wal-Mart Stores, Inc. Assoc. Welfare Plan v. Salazar,* 525 F.Supp. 2d 1103, 1111 & n. 4 (D.Ariz. 2007) (concluding that the SPD was an integral part of the plan  and should be considered when interpreting an ERISA plan, regardless of whether the plan explicitly incorporates the SPD) (citing *Bergt,* 293 F.3d at 1143). Although *Jobe* is not controlling here, this Court finds the reasoning persuasive, especially in light of the fact that the United States Court of Appeals for the Third Circuit has also held that SPDs are considered part of ERISA plan documents and should be considered when interpreting an ERISA plan.  *Skinner Engine,* 188 F.3d at 135 n. 3.  As the court of appeals noted, "[t]he SPD is the document to which the lay employee is likely to refer in obtaining information about the plan and in making decisions affected by the terms of the plan."  *Burstein,* 334 F.3d at 379.

The Court does not find persuasive the authority cited by Plaintiff for the proposition that an integration clause in the policy prevents the court from giving effect to additional terms in the SPD.  *See, e.g., Shaw v. Conn. Gen. Life Ins. Co.,* 353 F.3d 1276 (11th Cir. 2003); *Grosz-Salomon*

*v. Paul Revere Life Ins. Co.,* 237 F.3d 1154 (9th Cir. 2001); *Hirsh v. Life Ins. Co. of N. Am.,* No. C 04-0413 CW, 2005 WL 1514073 (N.D.Cal. June 21, 2005).  Plaintiff's reliance on these cases is misplaced, as they are factually distinguishable.  First, at issue in these cases was the applicable standard of review for a denial of benefits.  Thus, the language upon which the courts focused was the grant of discretionary authority to the plan administrator/fiduciary.  Second, and more importantly, the decisions in those cases did not appear to be predicated so much on the presence of an integration clause, but rather, on the fact that the version of the SPD containing the grant of discretionary authority was invalid for not following the procedures set forth in the policies for modifying or amending the SPDs.[7]  In contrast, in the case at bar, there has been no evidence or arguments presented to suggest that the SPD, as it pertains to the definitions of the terms at issue, was amended or modified in any way, let alone a suggestion that any such amendment was invalid.[8]  Accordingly, Plaintiff's cited authority is inapposite.

Plaintiff further argues that CGLIC's reliance on the SPD is misplaced because under the *de novo* standard of review, when a term such as "accident" is not defined in the policy, the administrator does not have discretion to apply its own definition of "accident," but rather, must rely upon federal common law under ERISA.  (Doc. No. 71 at 7.)  Therefore, according to Plaintiff, the court should not give any deference to CGLIC's "questionable choice to disregard the directive in the SPD that benefit determinations may be made only from the terms of the policy and further

---

[7]In the cases cited by Plaintiff, the policies did not contain any provisions conferring  discretionary authority to the plan administrator/insurer, but the SPDs did contain such language.

[8]Indeed, Plaintiff conceded in her brief in support of her motion for summary judgment that "[n]o amendments are involved in the present dispute."  Doc. No. 71 at 11 n. 13.

disregarding the total integration clause in the policy itself."[9]  (*Id.*)  In support, Plaintiff cites *Jones v. Metropolitan Life Insurance Company,* 385 F.3d 654 (6th Cir. 2004), for the proposition that a plan administrator may not add eligibility requirements to a plan where those requirements do not exist in the language of the plan.  Plaintiff's reliance on *Jones,* however, is misplaced.

In *Jones,* the insured, an industrial nurse, injured her knee at work when she bent down and squatted in order to render first aid to an employee.  385 F.3d at 658.  In denying the insured's claim for personal accident insurance ("PAI"), Met Life explained:

> The [PAI] plan itself does not define the word "accident" or "accidental," but applicable federal law does. Under applicable federal law, "accident" means an unforeseen undesigned sudden or unexpected event of an unfortunate character. However, injuries resulting from natural and ordinary activities are not "accidental"

---

[9] The "directive" to which Mrs. Erbe refers in the SPD is actually a disclaimer, which states that the SPD "does not contain all plan details" and, "[i]n determining specific benefits, the full provisions of formal plan documents and the insurance certificates . . . always govern" (R. 3). The Court does not construe the disclaimer as applying to a situation where, such as here, the Policy does not provide a definition of the terms, "accident," "injury," or "occupational accidental death" but the SPD does. Moreover, in such situations, several courts have found that the provisions in the policy and SPD compliment each other and have thus read the documents together to construe the provisions of the plan.  *See, e.g., Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan,* 144 F.3d 1014, 1023 (7th Cir. 1998) (citations omitted) (the rule of construction, that an SPD controls if a conflict exists between the underlying policy and the SPD, does not apply where no direct conflict exists or where the SPD is silent on an issue described in the policy; noting that where the policy clarifies rather than contradicts the SPD, there is no contradiction); *Morrison,* 326 F.Supp. 2d at 841 (holding that because the relevant provisions of the SPD and plan were complimentary as opposed to conflicting, the court read both provisions together to determine the time frame for instituting a legal cause of action); *cf. Burstein,* 334 F.3d at 379-80 (finding a material conflict existed between the SPD and plan document where SPD indicated that plan assets were held in trust and benefits would automatically vest upon plan termination regardless of years of service, while the plan document provided that upon termination or partial termination of the plan, the rights of participants to benefits accrued as of termination became nonforfeitable to the extent funded as of the date of termination). In any event, global or blanket disclaimers, which attempt to invalidate the entire SPD where a conflict exists with plan documents, run afoul of the requirement under 29 U.S.C. § 1022(a) that the SPD be "sufficiently accurate," and therefore, are ineffective. *See Mattias v. Computer Sciences Corp.,* 34 F.Supp. 2d 120, 127 (D.R.I. 1999).

> when there are no external forces or events to trigger the injuries. For example, a knee injury from bending and/or squatting does not constitute an accident.
>
> In your case, there was no outside occurrence that caused your injury. In the course of your employment as a registered nurse, you bent down and squatted to give first aid to an employee. Consequently, your knee injury was natural and not accidental.

*Id.* at 659.  In reaching this conclusion, Met Life relied on case law in which the insured died from a heart attack, and a presumption arose that the heart attack was caused by natural causes, unless rebutted by evidence of unusual activity, unforeseen trauma, or external force.  *Id.* at 663-64.  The court of appeals found those cases distinguishable from the situation before it because it concluded there was no presumption in the law that a knee injury results from natural causes, and the relevant federal common law did not require the insured to show that some external event or force triggered the insured's injury.  *Id.* at 664.  Indeed, the court of appeals found that federal common law that focused on the expectations and intentions of the insured should have been applied by Met Life.  *Id.* at 664-65.[10]  Accordingly, because neither the plan documents nor applicable federal common law supported Met Life's interpretation of the plan, the court of appeals concluded Met Life's benefit determination was arbitrary and capricious.  *Id.* at 665.

    *Jones* is distinguishable from the case at bar on two fronts.  First, in *Jones,* the term "accident" was not defined in either the plan or the SPD.  Therefore, it was necessary to turn to federal common law to supply the definition of "accident."  Here, the term "accident" is defined in

---

[10]As an example, the *Jones* court cited *Critchlow v. First UNUM Life Ins. Co. of Am.,* 378 F.3d 246, 259-261 (2d Cir.2004); *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121, 1125, 1127-30 (9th Cir.2002); *Cozzie v. Metro. Life Ins. Co.,* 140 F.3d 1104, 1109-110 (7th Cir.1998); *Santaella v. Metro. Life Ins. Co.,* 123 F.3d 456, 463-65 (7th Cir.1997); *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1456 (5th Cir.1995); *Wickman v. Northwest National Insurance Company,* 908 F.2d 1077,1088-89 (1st Cir. 1990).

the SPD.  Second, unlike the plan administrator in *Jones,* CGLIC is not attempting to add new eligibility requirements not found in the plan documents or not supported by relevant case law.  The eligibility requirement of an unusual  and external event is expressly stated in the definition of "accident" contained in the SPD.  In addition, unlike *Jones,* the insured in this case died from a heart attack.  Therefore, even if the SPD had not defined the term "accident,"  the case law cited by CGLIC would be relevant to establish the eligibility requirements for an accident in heart attack cases.  Accordingly, Plaintiff's argument that CGLIC is attempting to add new eligibility requirements or terms to the Policy is simply unavailing.[11]

Therefore, for all of the above reasons, and for the reason set forth in Part 2 below, the Court finds that it is not precluded from considering the definitions set forth in the SPD in construing the terms contained in the Policy.[12]

## 2.     Whether the Terms at Issue are Ambiguous

Traditional rules of contract construction, as contained in federal common law, apply to the interpretation of employee benefit plans subject to ERISA.  *Skinner Engine,* 188 F.3d at 138;

---

[11]Plaintiff's reliance on *University Hospitals of Cleveland v. Emerson Electric Company,* 202 F.3d 839 (6th Cir. 2000), is also misplaced.  In that case, the court found the plan administrator effectively rewrote the plan language regarding an exclusion for a pre-existing condition where it added a requirement that was contrary to the plain language of the plan.  *Id.* at 849.

[12]Also without merit is Plaintiff's argument that the Court is precluded from considering the SPD because CGLIC did not refer to the SPD in its initial denial letter.  This Court is conducting a *de novo* review of CGLIC's final decision denying benefits, and therefore, it may consider any and all documents that are part of the administrative record below.  This includes the documents considered by CGLIC in issuing the initial denial letter, as well as those considered in deciding the appeal.  Moreover, because the Court is not limited to determining whether CGLIC's determination was arbitrary and capricious, CGLIC's rationale for denying benefits is not relevant.  In any event, Mr. Erbe would have been provided with a copy of the SPD as a plan participant, and Plaintiff does not contend otherwise.

*Hooven v. Exxon Mobil Corp.,* 465 F.3d 566, 572 (3d Cir. 2006) (citing *Kemmerer v. ICI Americas Inc.,* 70 F.3d 281, 287 (3d Cir. 1995)).   The determination of whether terms in an ERISA plan document are ambiguous is a question of law.   *Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley,* 248 F.3d 206, 218 (3d Cir. 2001).   "A term is 'ambiguous if it is subject to reasonable alternative interpretations.'"  *Id.* (quoting *Taylor v. Cont'l Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1232 (3d Cir. 1991) (citing *Mellon Bank, N.A. v. Aetna Bus. Credit Inc.,* 619 F.2d 1001, 1011 (3d Cir. 1980)).   In ascertaining whether terms in a plan document are ambiguous, the court must first look to the plain language of the document.   *Id.* (citing *In Re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 58 F.3d 896, 902 (3d Cir. 1995)).   In so doing, the court:

> do[es] not simply determine whether, from [its] point of view, the language is clear. Rather, [the court] "hear[s] the proffer of the parties and determine[s] if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *Sheet Metal Workers,* [*Local 19 v. 2300 Group, Inc.,*] 949 F.2d [1274,] 1284 [(3d Cir.1991)] (quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980)). Before making a finding concerning the existence or absence of ambiguity, [the court must] consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. *Id.*; [*Int'l Union, United Auto., Aerospace & Agric. Implement Workers v.*] *Mack Trucks,* [*Inc.,*] 917 F.2d [107,] 111 [(3d Cir.1990)]; *see also* Restatement (Second) of Contracts § 223 cmt. b (1981) ("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown...."). Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.

*Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d

Cir. 1993).[13]  However, as the court of appeals warned in *Mellon Bank*:

> [This] approach does not authorize a trial judge to demote the written word to a reduced status in contract interpretation.  Although extrinsic evidence may be considered under proper circumstances, the parties remain bound by the appropriate objective definition of the words they use to express their intent. Generally parties will be held to definitions given to words in specialized commercial and trade areas in which they deal.  Similarly, certain words attain binding definition as legal terms of art.. . . Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally consistent.

619 F.2d at 1013 (footnotes and citations omitted).   Once the court determines that the terms in the plan documents are unambiguous, it may no longer consider extrinsic evidence in order to construe those terms.  *Bill Gray,* 248 F.3d at 218.

Finally, although the rule of *contra proferentem* may be invoked in construing the terms of an ERISA plan, it is to be applied only as a last resort if the court is unable to ascertain the intent of the parties.  *Taylor,* 933 F.2d at 1233-34; *Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1257-58 (3d Cir. 1993).  As the court of appeals explained, "[u]nder that rule, 'if, after applying the normal principles of contractual construction, '[an] insurance contract is fairly susceptible of two different interpretations, . . . the interpretation that is most favorable to the insured will be adopted.' '" *Heasley,* 2 F.3d at 1257 (quoting *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 539 (9th Cir. (1990) (quoting A. Windt, INSURANCE CLAIMS & DISPUTES § 6.02, at 281-82 (2d ed. 1988)).

---

[13]The court of appeals further noted that even though a writing may be integrated, agreements and negotiations prior to or contemporaneous with the adoption of a writing are nonetheless admissible to establish the meaning of ambiguous terms in the writing.  *Martin v. Monumental Life Ins. Co.,* 240 F.3d 223, 233 (3d Cir. 2001) (citing *Mellon Bank,* 619 F.2d at 1011).

With these precepts in mind, the Court turns now to the respective arguments of the parties.

Because the term "accident" is not defined in the Policy, Plaintiff submits that the Court must look to federal common law to supply the definition for that term, and in doing so, the Court must interpret such terms in "an ordinary and popular sense," and in a way that "a person of average intelligence and experience" would interpret them.[14]  (Doc. No. 71 at 12.)  Thus, according to Plaintiff, under federal common law, the term "accident" is commonly defined as "an unexpected or unintentional happening."  In support, Plaintiff relies primarily on *Padfield v. AIG Life Insurance Company*, 290 F.3d 1121 (9th Cir. 2002), and *Santaella v. Metropolitan Life Insurance Company*, 123 F.3d 456 (7th Cir. 1997), as well as several district court cases from outside the Third Circuit. In further support of her argument, Plaintiff turns to Pennsylvania common law,[15]  which she submits is in accord with ERISA federal common law, both with respect to the principle that when the term "accident" is not defined in a policy, the court must look to common law to provide the definition, and also, with regard to the common law definition of "accident" itself.[16]  Thus, Plaintiff

---

[14]Plaintiff cites a number of cases from district courts and one court of appeals, all from outside the Third Circuit, and none of which are binding on this Court.

[15]Generally, federal common law, not state law, governs the interpretation of an employee benefit plan subject to ERISA.  *Nally v. Life Ins. Co. of N. Am.,* 299 F. App'x 125, 128 n. 2 (3d Cir. 2008) (citing *Feifer v. Prudential Ins. Co. of Am.,* 306 F.3d 1202, 1210 (2d Cir. 2002); *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 572 (3d Cir. 2006)).  However, where no federal common law precedent has been developed on a particular ERISA issue, a federal court may consider  relevant state common law in attempting to develop ERISA federal common law.  *See, e.g., Klei v. Metro. Life Ins. Co.,* No. 91-CV-76942-DT, 1992 WL 695749, at *6 n. 9 (E.D. Mich. Oct. 30, 1992) (citing *Wickman v. Nw. Nat'l Ins. Co.,* 908 F.2d 1077, 1084 (1st Cir. 1990); *Adkins v. Reliance Std. Life Ins. Co.,* 917 F.2d 794 (4th Cir. 1990)).

[16] In this regard, Plaintiff  turns to the decision of the Pennsylvania Supreme Court in *Donegal Mutual Insurance Company v. Baumhammers,* 938 A.2d 286 (Pa. 2007), in which the court explained:

The Donegal homeowners insurance policy provides no definition of the term

24

contends the term "accident," in the usual, ordinary and popular sense, means an unexpected or unintentional happening or event.

On the other hand, CGLIC contends that the SPD provides the definitions of the terms at issue, and therefore, the Court need not look to federal common law to provide the definitions. CGLIC's argument in support of this position is two-fold.  First, assuming the Court finds that it is not precluded from considering the SPD in construing the terms at issue in the Policy, CGLIC submits that the nature of the SPD as a key plan document signifies that is it strong evidence of the plain and unambiguous meaning of the terms as understood by the contracting parties and as ordinarily used in the context of an accidental death and dismemberment policy.  Second, in the alternative, CGLIC argues that if the Court finds the definitions in the SPD are not part of the Policy, then despite the presence of an integration clause in the Policy, the Court may examine extrinsic evidence, such as the SPD, to determine whether the terms at issue in the Policy are ambiguous.

---

"accident." However, we have established that the term "accident" within insurance polices refers to an unexpected and undesirable event occurring unintentionally, and that the key term in the definition of the "accident" is "unexpected" which implies a degree of fortuity. *Kvaerner*, 589 Pa. at 333, 908 A.2d at 898. An injury therefore is not "accidental" if the injury was the natural and expected result of the insured's actions. *See Lower Paxton Twp. v. U.S. Fidelity and Guar. Co.*, 383 Pa.Super. 558, 567, 557 A.2d 393, 398 (1989) ("[An] [a]ccident is an event that takes place without one's foresight or expectation. It is an undesigned, unexpected event. The term accident within the meaning of an insurance policy is an event happening by chance unexpectedly taking place. It is the opposite of something likely to occur, foreseeable in due course."). *See also Minnesota Fire and Cas. Co. v. Greenfield*, 579 Pa. 333, 359, 855 A.2d 854, 870 (2004) (" 'Accident' has been defined in the context of insurance contracts as an event or happening without human agency or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens.") (citations omitted).

938 A.2d at 292. It is significant to note, however, that the policy at issue in *Baumhammers* did not provide a definition of the term "accident."

CGLIC further contends that because the SPD is a key plan document and it was created and provided to participants in 2000, several years before Mr. Erbe's death, it is dispositive and uncontradicted evidence of the meaning of the terms "accident" and "injury" as understood by the parties. Moreover, because objective evidence of the parties' intent is available, CGLIC argues the rule of *contra proferendem* does not apply here.

In light of this Court's earlier finding–that the SPD may be considered in construing the terms of the Policy despite the presence of an integration clause–the Court thus concludes that the nature of the SPD as a key plan document provides strong evidence of the plain and unambiguous meaning of the terms "accident" and "injury" as understood by the contracting parties and as used in the Policy. The definitions contained in the SPD do not conflict with any provisions in the Policy. The SPD was created at approximately the same time as the Policy in 2000, well in advance of Mr. Erbe's death. Thus, as the SPD is the only objective indicia, from the linguistic reference point of the contracting parties,[17] demonstrating their intent as to the meaning of the terms "accident" and "injury," the Court is compelled to conclude that the terms at issue here are not ambiguous. Accordingly, the Court will apply the definitions of those terms as contained in the SPD.

In so concluding, the Court rejects Plaintiff's argument that this Court must look to federal common law to supply the "ordinary and popular" meaning of the undefined terms. Because this Court has determined that the SPD is part of the plan documents despite the integration clause, and the SPD defines the terms at issue, there is no need to look to federal common law to supply the definitions. Consequently, all of the cases cited by Plaintiff in support of her argument are

---

[17] Mr. Erbe did not contract with CGLIC to purchase AD&D insurance coverage, but rather was provided with the AD&D Policy as part of the employee benefits he received from his employer, Exxon Mobil.

inapposite, as neither the policies nor the SPDs in those cases defined the term "accident."

Finally, Plaintiff contends that the SPD definitions should not be used because the definition of "accident" as stated in the SPD constitutes an "accidental means" approach, which is completely at odds with federal[18] and Pennsylvania common law,[19] both of which have abandoned the accidental means–accidental result distinction.[20]   In response, CGLIC argues that the "accidental means"

---

[18]Plaintiff submits that all of the courts of appeals that have applied a common law definition of accident have abandoned the accidental means-results distinction. *See, e.g., Wickman, supra* (First Circuit); *Critchlow v. First UNUM Life Ins. Co.,* 378 F.3d 246 (2d Cir. 2004); *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448 (5th Cir. 1995); *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121 (9th Cir. 2002); *Santaella v. Metro. Life Ins. Co.,* 123 F.3d 456 (7th Cir. 1997); *Cozzie v. Metro. Life Ins. Co.,* 140 F.3d 1104 (7th Cir. 1998); *Winchester v. Prudential Life Ins. Co.,* 975 F.2d 1479 (10th Cir.1992).  In response, CGLIC argues although in almost all of the above cases the courts of appeals rejected an accidental means test and applied a foreseeability test, they did so only in the context of determining whether a person died of intentionally self-inflicted injuries such as a drug overdose.  Consequently, CGLIC submits those cases have little bearing on a death, such as the one at issue here, that involves natural causes.  *Winchester,* the lone exception, is otherwise distinguishable on its facts.  *See* discussion, *infra,* in this regard.

[19]The Pennsylvania Supreme Court also appears to have abandoned the accidental means-results distinction.  *See Beckman v. Travelers Ins. Co.,* 225 A.2d 532, 535 (Pa. 1967).  CGLIC contends that the court in *Beckman* did so only in the context of determining whether the insured died of intentionally self-inflicted injury, *i.e.,* a drug overdose, under a non-ERISA personal accident policy, and thus had no bearing here.

[20]The distinction between accidental means and accidental results is predicated on the notion that "means" is synonymous with "cause," and thus, "accidental means" refers to the occurrence or happening which produces the result, as opposed to the result itself; " . . . it is concerned with the cause of the harm rather than the character of the harm."  COUCH ON INSURANCE § 139:21 & n. 7. The recent trend among courts is to abandon the distinction between accidental means and results, because of the difficulty, confusion and inconsistency that has resulted in attempting to apply this distinction in accidental death/injury cases.  *Id.*  Indeed, the attempted distinction in this area of the law has been described by Justice Cardozza as plunging into a "Serbonian Bog."  *Id.* at § 139:22 & n. 19 (referring to a phrase from Milton's *Paradise Lost* that "describ[es] a bog so teacherous that 'Armies whole' had sunk into it.") (citing *Landress v. Phoenix Mut. Life Ins. Co.,* 291 U.S. 491, 499 (1934) (Cardozza, J., dissenting)).  According to Couch, abandoning this distinction is unlikely to completely eliminate the "semantic quagmire" that exists in the area of accident insurance, because a number of courts, including the *Wickman* court, have substituted a test for coverage that focuses on foreseeability, which is  essentially a tort concept, but was also cited by the courts as a major objectionable feature of the means-results distinction.  *Id.* at § 139:23.

distinction is still viable in this circuit, albeit in *dicta*, in *Shiffler v. Equitable Life Assurance Society of United States,* 838 F.2d 78, 85 n.9 (3d Cir. 1988).[21]   The Court finds no merit to Plaintiff's argument.[22]

The court of appeals decision in *Wickman v. Northwest National Insurance Company,* 908 F.2d 1077 (1st Cir. 1990), is instructive and addresses Plaintiff's argument.  In *Wickman,* the policy contained almost an identical definition of "accident" as that contained in the SPD here,[23] yet the court of appeals did not reject the definition of accident contained in the policy, even though it rejected the accidental means-results distinction.  Rather, the *Wickman* court applied the definition stated in the policy, noting that there was no dispute  that the first three criteria–external, violent and sudden–had been met. 908 F.2d at 1085. As to the fourth criteria, whether the accident was "expected," the parties disagreed, and upon consideration of that criteria alone, the court of appeals rejected a test that was based on a distinction between accidental means and accidental results.  *Id.* at 1085, 1088.  Thus, *Wickman* does not support the wholesale rejection of the definition of accident contained in the SPD.

---

[21]The court of appeals in *Shiffler* suggested that a heart attack that occurs as a result of job stress and tension from alleged harassment at work is likely not a product of violent, external and accidental means.  *Id.* at 85 n. 9.

[22]Regardless of whether or not the court of appeals in this circuit would abandon the accidental means-results distinction if faced with that question, a question that this Court need not reach, the Court may not rewrite the plan documents to exclude express provisions under the guise of contract interpretation.  Rather, the Court is "required to enforce the Plan as written unless [it] find[s] a provision of ERISA that contains 'a contrary directive.'" *Bauer v. Summit Bancorp.*, 325 F.3d 155, 160 (3d Cir. 2003) (citations omitted).  The Court is not aware of any contrary directive in ERISA that would preclude it from applying the plan language as written here.

[23]The only difference between the two definitions is the word "event."  In the case at bar, the SPD uses the word "incident" instead of "event."  These two words are synonymous.  *See* THE RANDOM HOUSE THESAURUS, at 246 (Coll. ed. 1989) (synonyms listed for "event" include "occurrence," "happening," and "incident," among others).

### 3.    Whether There Was A Covered "Accident" Under The Policy

Initially, the person claiming entitlement to accidental death benefits bears the burden of proving that an "accident" occurred.  *See, e.g., Haley v. Am. Int'l Life Assurance Co. of N.Y.*, 789 F.Supp. 260, 262 (N.D.Ill. 1992); *Arthurs v. Metro. Life Ins. Co.,* 760 F.Supp. 1095, 1101 n.3 (S.D.N.Y. 1991) (beneficiary must show death was accidental and insurer bears burden of showing death falls within exception to accidental death clause) (citations omitted).  In the case at bar, "accident" is defined as a "sudden, violent, unexpected, external incident."  Thus, preliminarily, Plaintiff must prove that a sudden, violent, unexpected, external incident or event occurred.

Plaintiff posits that two lines of approaches have developed under federal common law for determining whether a heart attack falls within the definition of accident in an accidental death policy.  Under the first approach, utilized in *Wickman*, a foreseeability analysis is applied, while under the second approach, the courts have applied an accidental means approach, which looks more to a "triggering event" of the heart attack or analyzes the event by virtue of whether the activity done prior to a heart attack could be considered "unusual."  Although Plaintiff contends the preferred approach is the foreseeability approach adopted in *Wickman*,[24] Plaintiff submits that under either approach, Mr. Erbe's death constituted an accident.  Plaintiff also submits that even if the definition of "accident" in the SPD is determined to apply, Mr. Erbe's death still satisfies the requirements under the Policy.

Plaintiff urges the Court to apply the foreseeability analysis  delineated in *Wickman*.  In

---

[24]Plaintiff submits that the foreseeability approach in *Wickman* provides a more complete analysis, while the "accidental means" approach tends to rely on artificial presumptions and over-relies on the analysis of whether the insured was doing his job in the "usual" way.  (Doc. No. 74 at 12.)

determining whether an accident had occurred thus entitling the beneficiary to coverage under the policy, the court of appeals in *Wickman* first looked to the definition of accident contained in the policy–"an unexpected, external, violent and sudden event."  908 F.2d at 1084-85.[25]  As noted above, this definition is virtually identical to the definition of accident contained in Erbe's SPD.  The *Wickman* court did not discuss or analyze whether the event in that case, *i.e.,* the insured's 40 to 50 foot fall from a bridge onto railroad tracks, was external, violent or sudden, other than to note that the parties conceded that the event met all three criteria.  *Id.* at 1085.   As to the fourth criteria, whether the fall was "unexpected," the parties disagreed, and thus, the court of appeals turned its focus to the appropriate level of expectation necessary for an act to constitute an accident.[26]  After thoroughly examining the two approaches employed by various courts for determining whether an injury was unexpected and thus accidental, the court of appeals rejected the first approach, which was based on a distinction between accidental means and accidental results, and instead opted to apply an approach which examines the reasonable expectations of the insured and includes both subjective and objective components.  *Id.* at 1088.  In the subjective component, the fact-finder must first determine whether the insured expected to suffer an injury similar in type or kind to that actually suffered.  *Id.* (citation omitted).  If the fact-finder determines that the insured did not expect to suffer an injury similar to the one actually suffered, then it must examine whether the underlying suppositions were reasonable.  *Id.*  Should the trier of fact find the suppositions were unreasonable,

[25]Notably, the author of the opinion in *Wickman* was Circuit Judge Rosenn of the U.S. Court of Appeals for the Third Circuit, sitting by designation.

[26]In so doing, the *Wickman* court did not abandon the external, violent, and sudden criteria, as set forth in the definition of accident contained in the policy.  Rather, since the parties did not dispute the presence of these criteria, the court directed its analysis to the only disputed criteria.

then the injury will not be accidental.  *Id.*  In determining what suppositions are unreasonable, the fact-finder should make this determination "from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences."  *Id.* (citations omitted).  As to the objective component, the court of appeals in *Wickman* provided the following guidance:

> Finally, if the fact-finder, in attempting to ascertain the insured's actual expectation, finds the evidence insufficient to accurately determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of the insured's expectations. *See Hoffman*, 669 P.2d at 419. In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct. *See City of Carter Lake v. Aetna Cas. and Sur. Co.*, 604 F.2d 1052, 1058-59 & n. 4 (8th Cir.1979). An objective analysis, when the background and characteristics of the insured are taken into account, serves as a good proxy for actual expectation. Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured. *See Sanders v. Prudential Ins. Co.*, 697 S.W.2d 80 (Tex.Ct.App.1985).

908 F.2d at 1088.

In the case at bar, Plaintiff posits that Mr. Erbe's injury and subsequent death occurred from an event that took place without his foresight or expectation and not in the regular course of things. In support, Plaintiff submits that Mr. Erbe donned unusually hot and restrictive safety clothing in an extremely hot environment in which he did not work on a regular basis.  Plaintiff further submits that Mr. Erbe was not aware that he suffered from arteriosclerosis prior to or at the time of his heart attack.  According to Plaintiff, as a direct result of Mr. Erbe's activities and the extreme environmental conditions on the day of his death, his heart muscle required a higher level of oxygen than could be provided by his arteries, and due to insufficient oxygen, he suffered myocardial

necrosis and infarct, an injury under the Policy, and, as a direct result of this myocardial infarct injury, Mr. Erbe died.  Consequently, Plaintiff maintains that Mr. Erbe's death resulted from an accident.  (Doc. No. 71 at 15-16.)

Applying the subjective prong of *Wickman*, Plaintiff argues that although Mr. Erbe had an underlying heart condition, he had no reason to have known of the condition prior to his death.  In support, Plaintiff submits that Mr. Erbe was healthy, lived an active lifestyle, and had been examined annually by doctors, including a full cardiac work-up five years prior to his death, with no indication of the heart condition which contributed to his injury and death.  Thus, Plaintiff contends Mr. Erbe clearly had no expectation that injury or death could occur.  (Doc. No. 71 at 16-17.)  With regard to the second prong of *Wickman,* Plaintiff submits that Mr. Erbe's expectation that death or injury was not likely to occur on July 21, 2003 was entirely reasonable because Mr. Erbe believed that he was in good health, and had conducted inspections in the past**.**  Further, Plaintiff argues that because plant personnel provided Mr. Erbe with safety clothing and he observed his co-worker wearing the same safety clothing under the same environmental conditions over the same period of time, he reasonably assumed that wearing the same safety clothing was safe.  Thus, as Mr. Erbe neither subjectively nor objectively expected death or injury, Plaintiff maintains that his death resulted from an accident under federal common law.  (Doc. No. 71 at 17-18.)

In response, CGLIC argues that a pure foreseeability test has no application in a case involving a death from natural causes, as the *Wickman* court itself specifically stated that "it was undisputed that the fall was external, violent and sudden, but the parties disagree over whether it was unexpected."  908 F.2d at 1085.  CGLIC thus argues that the test articulated in *Wickman* is meant to apply only to determine one small part of the accident definition, *i.e.,* whether the result from

32

intentional conduct was reasonably unexpected.  Although the other elements of the definition of accident had already been satisfied when the foreseeability test was applied in *Wickman*, CGLIC argues the same is not true here.  Instead, CGLIC cites to a number of cases involving similar circumstances in support of its contention that death from a heart attack when performing one's ordinary job duties is a death from a natural cause, not an accident.[27]

The Court declines to apply a straight foreseeability approach to the case at bar as urged by Plaintiff.  Although this Court acknowledges that the foreseeability approach adopted in *Wickman*

_____

[27]*See* CGLIC's Mem. of Law in Opp'n to Pl's Mot. for Summ. J. (Doc. No. 73) at 12-14; *see also* discussion, *infra* at 40-41.  CGLIC also submits that this Court may look to Pennsylvania law for guidance in developing federal common law under ERISA, and points to *Semancik v. Continental Casualty Company,* 56 Pa.Super. 392, 1914 WL 4672, at *3 (1913), a case interpreting language of an AD&D policy under similar circumstances to those here and holding that a sunstroke brought on by the decedent's normal job duties did not warrant benefits because there was no unusual activity or external unexpected force or event.  CGLIC also cites several decisions of the Pennsylvania Superior Court decided under the pre-1972 amendments to the Pennsylvania Workmen's Compensation Act ("WCA") which included an accident requirement in order to qualify for benefits. (Doc. No. 66 at 12-13.)  CGLIC submits these cases support its position that heart attacks brought on by a decedent's normal job duties do not warrant benefits because there was no unusual activity or external unexpected force or event.  In opposition, Plaintiff argues that the workers' compensation caes cited by CGLIC under the old WCA were decided under a workers' compensation principle known as the unusual strain doctrine, which is now defunct and thus is inappropriate here.  In addition, Plaintiff posits that CGLIC has ignored a long line of pre-1972 workers' compensation cases which held sunstroke and heat exhaustion to be accidents. (Doc. No.74 at 6 n.5.)  Plaintiff also contends that Louisiana and New Jersey workers' compensation laws should be consulted regarding the definition of the term "accident," as the Policy provides that Louisiana law shall govern (R. 68), and the SPD states in its definition of occupational accidental death that if no workers' compensation law was applicable, the New Jersey workers' compensation law would apply (R. 43).  Because the Court has determined that the definition of accident contained in the SPD applies, there is no need to consider the definition of accident under various state workers' compensation laws that are potentially in conflict with ERISA federal common law.  As noted above, the court is required to interpret an ERISA plan under federal common law and may only consider relevant state law where there is no federal common law precedent on a given issue.  *See* note 15, *supra.*  The Court does not believe the workers' compensation cases cited by the parties are relevant to the outcome here.

has been accepted by a number of district courts within this circuit, as well as by other federal courts of appeals, nonetheless, the Court agrees with CGLIC that such approach does not lend itself to cases such as the one at bar involving deaths from heart attacks.  Indeed, for the most part, those cases applying the *Wickman* foreseeability approach, and *Wickman* itself, involved issues over whether the insured died as a result of an intentional self-inflicted injury, *i.e.,* drug overdose, autoerotic asphyxiation, or car accident while driving intoxicated, as opposed to death from natural causes.[28]  In *Wickman* and its progeny, the courts were concerned with distinguishing between a death from an intentional act (suicide) or from reckless behavior that the insured knew or should have known was likely to result in death, and death that was "accidental" because it was merely the result of negligent conduct.  *See, e.g., Santaella v. Metro. Life Ins. Co.,* 123 F.3d 456, 463-65 (7th Cir. 1997) (concluding a drug overdose was an accident and not an intentionally inflicted injury); *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448 (5th Cir. 1995) (holding that death from autoerotic asphyxiation was accidental not intentional); *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121 (9th Cir. 2002) (same); *c.f. Poeppel v. Hartford Life Ins. Co.,* 273 F.Supp.2d 714 (D.S.C. 2003) (holding death was not accidental because insured's conduct was deemed reckless where he was driving drunk and was killed when his car crashed into a tree), *aff'd* 87 F. App'x. 885 (4th Cir. 2004). In such situations, the critical focus was on the expectations and intentions of the insured.  *Riesterer v. Crown Life Insurance Company,* 653 F.2d 268, 269-70 (6th Cir. 1981) (citing *Collins v. Nationwide*

---

[28] The one exception where a court applied a straight foreseeability test to a natural cause of death case was in *Winchester v. Prudential Life Insurance Company,* 975 F.2d 1479, 1486, 1488 (10th Cir. 1992).  Although the court of appeals found the heart attack was an accident, it nonetheless concluded that coverage did not exist under the policy because  it found the heart attack was not a bodily injury and that the heart attack did not arise directly and independently of all other causes.

*Life Ins. Co.,* 294 N.W.2d 194 (Mich. 1980)) (the court of appeals found its decision was not inconsistent with a ruling by the Michigan Supreme Court, which held that death resulting from voluntary intoxication was accidental, because in the latter case, the state court was concerned with distinguishing accidental from intentional death, which involved an examination of the expectations and intentions of the insured).[29] Such an analysis does not take into account a situation where the insured died from a sudden heart attack, which was due to natural causes, because in focusing exclusively on whether the result, *i.e.,* death, was expected or foreseeable, any sudden death, regardless of the cause, would then be considered an accident. *See Parker v. Danaher Corp., on Behalf of Danaher Corp. Employee Benefit Plan,* 851 F.Supp. 1287, 1292 (W.D.Ark. 1994)[30] ("It has been said that '[d]eath is almost always accidental in the sense of unintended by the deceased, so if an accidental result sufficed, coverage would be assured regardless of the cause of death.'") (quoting *Senkier v. Hartford Life & Acc. Ins. Co.,* 948 F.2d 1050, 1052 (7th Cir. 1991)). As the district court opined in *Howard v. National Education Association of New York,* 984 F.Supp. 103 (N.D. N.Y. 1997):

> Obviously, the sudden heart attack suffered by [the insured] was neither expected nor foreseen by him. However, the problem with a definition of accidental death that relies exclusively on the foreseeability of the event is that any sudden death resulting from natural causes must then be considered an accident. Common sense,

---

[29] Because it was distinguishing accidental death from death by disease, the court of appeals in *Riesterer* concluded that the state court's emphasis on the expectations and intentions of the insured provided little guidance in on-the-job heart attack cases. 653 F.2d at 269-70.

[30]*Parker* involved death caused by autoerotic asphyxiation, and although the court agreed with *Wickman* that the means-results distinction should not be adopted in ERISA cases, it declined to apply *Wickman's* subjective/objective analysis, because the court found it shed little light in this area of the law. Rather, the *Parker* court, following the directive of the Eighth Circuit, accorded the term "accident" its natural meaning. 851 F.Supp. at 1295.

> however, dictates that the common understanding of "accidental" is
> not so broad.

984 F.Supp. at 108.

More importantly, a straight foreseeability approach runs afoul of the plain language of the definition of accident contained in the SPD.  Here the Court is bound to apply the definition contained in the SPD in determining whether a covered accident occurred.  That language clearly requires that the *incident*, *i.e.,* triggering event, be sudden, violent, unexpected and external.  Thus, the fact that Mr. Erbe did not expect to suffer an injury or die as a result of his activities during the inspection in extreme environmental conditions is not determinative of whether a covered accident occurred under the Policy.   Accordingly, the Court declines to apply the *Wickman* foreseeability approach to this case.

In any event, even if this Court adopted the foreseeability approach applied in *Wickman*, that would not be determinative of whether Erbe's death was accidental.  As in *Wickman,* here the definition of accident contains three other elements–sudden, violent, and external–and these elements modify the word "incident."  Thus, Plaintiff must show that the incident, or triggering event, in addition to being unexpected, was also sudden, violent, and external.  Here, Plaintiff alleges the triggering event was Mr. Erbe's strenuous physical activities in extreme environmental conditions during the inspection on the date of his death.  Plaintiff submits that her husband's death satisfies all of the requirements of an accident as defined under the Policy.  In support of her argument, Plaintiff relies on the definitions of "external" and "violent" as stated in a leading treatise on insurance law,[31] and based on that, submits that Mr. Erbe's *death* was sudden and unexpected,

---

[31]In discussing language in an accidental death policy that covers injuries inflicted by external, violent and accidental means, the author of the treatise provided the following guidance as to the

and it (presumably also referring to "death") meets the requirements of external and violent as defined in accidental death policies.  (Doc. No. 80 at 5 n.5.)

The infirmity with Plaintiff's argument is that she applies the required elements to Mr. Erbe's death, as opposed to the incident or event that triggered his death.  This is in direct contradiction to the plain language of the definition of accident as contained in the SPD, a key plan document.  An examination of the record reveals that the triggering event here was neither sudden nor unexpected. The common and ordinary understanding of the term "sudden" is "[o]f actions, events, conditions: Happening or coming without warning or premonition; taking place or appearing all at once." OXFORD ENGLISH DICTIONARY ONLINE (2d ed. 1989), http://dictionary.oed.com (last visited Feb. 5, 2010).  Mr. Erbe obviously knew prior to the inspection on July 21, 2003 that he was going to be inspecting machines in the hot mill section of the plant.  In addition, that inspection lasted between 2 ½ and 3½ hours.  Thus, the Court finds that these facts do not establish that the triggering event was sudden.  Likewise, the record does not support a finding that the triggering event was unexpected or unforeseen.  Having conducted inspections of the same gear boxes in the past (*see* discussion *infra* at 46-47 (R. 156-61, 195, 204-06)), Mr. Erbe was surely aware of the physicality

meaning of "external" and "violent":

> In order to constitute a death or injury as one which is produced by "external" means, it is not necessary that the external means should itself cause such death or injury; it is only necessary that the cause of death shall be external to the person although it acts internally. "Violent" refers to some act not occurring in the ordinary run of things and may be fulfilled by any force whatsoever, however slight. It has been said that unnatural death, the result of an accident of any kind, imports an external and violent agency as the cause, within the meaning of an insurance policy limiting recovery to death caused through "external, violent, and accidental means."

COUCH ON INSURANCE § 139:18 (internal footnotes omitted).

involved in such inspections, as well as the extreme heat.  Thus, it was not unexpected or unforeseeable that the temperature would be extremely hot in the area where the inspection was to take place.  Accordingly, Plaintiff has failed to satisfy her burden of proving a covered accident occurred under the Policy.

Alternatively, Plaintiff submits that she has shown that her husband's death was accidental under an approach applied by a number of courts in heart attack cases.  Under this approach, the court looks to whether there was a triggering event of the heart attack or whether the activity done prior to the heart attack could be considered unusual. Plaintiff advances several arguments under this alternative approach.

First, Plaintiff posits that a number of courts have found that when the federal common law definition of accident is utilized in combination with the *Wickman* foreseeability test, a heart attack triggered by an event caused through human agency can, under appropriate circumstances be considered an accident.[32]  In support of her argument, Plaintiff relies primarily on *Winchester v. Prudential Life Insurance Company,* 975 F.2d 1479 (10th Cir. 1992).[33]  In *Winchester,* the court applied a foreseeability analysis to determine whether the insured's death from a heart attack was

---

[32] Plaintiff concedes, however, that a heart attack where no event has occurred is not an accident even where the heart attack itself was unexpected.  (Doc. No. 74 at 17.)

[33] Plaintiff also relies on several Colorado cases, all of which are factually distinguishable from the case at bar.  *See, e.g., Carroll v. CUNA Mut. Ins. Soc.*, 894 P.2d 746 (Colo. 1995) (death from massive intracranial hemorrhage during sexual intercourse); *Reed v. U.S. Fid. & Guar. Co.,* 491 P.2d 1377, 1380 (Colo. 1971) (smoke inhalation while fighting fire was unforeseen exacerbation of heart condition and therefore death was accidental; applying common understanding of "accident" and different policy language); *Pirkheim v. First UNUM Life Ins. Co.,* 50 F.Supp. 2d 1018, 1024 (D.Colo.1999) (applying common meaning of term accident, court found the malfunction of pacemaker was clearly an unusual and unexpected event and therefore, an accident occurred under the policy).

an accident under the policy.  In that case, the insured worked as a plant operator at an electrical power plant.  He died as a result of an apparent heart attack following a firefighting training exercise at the plant, during which he wore a fireproof rubber suit.  975 F.2d at 1482.  No autopsy was performed.  The surviving spouse's claim for accidental death benefits was denied.  In determining whether the insured's death was accidental, the court turned to common law for the definition of accidental, as that term was not defined in the policy.  *Id.* at 1487.  Applying Utah law in an ERISA case, the court of appeals held the "less strict standard of defining 'accidental' as a result that was not reasonably foreseeable, even if the means causing the result was foreseeable or even intentional" applied.  *Id.* (citation omitted).  Because the insured presumably did not foresee suffering heart failure as a result of his participation in the firefighting training, the court of appeals concluded his death was accidental.

In response, CGLIC argues that the *Winchester* court erroneously applied a straight foreseeability analysis to determine whether the heart attack was accidental.  In any event, CGLIC points out that the court of appeals ultimately denied coverage because the plaintiff failed to establish the remaining criteria, *i.e.,* that the heart attack constituted a bodily injury and that the injury, directly and independently of all other causes, resulted in death.

Although the facts surrounding the insured's death in *Winchester* are similar to the facts surrounding Mr. Erbe's death, that case is distinguishable in one very important respect.  The *Winchester* court applied the Utah common law definition of accident because it was not defined in any of the plan documents.  The court of appeals held that under Utah law, death is deemed accidental if the insured did not reasonably foresee suffering a fatal heart attack as a result of his work activity, even though the cause or triggering event was foreseeable or intentional.  975 F.2d

at 1487.  By contrast, in Erbe's plan documents, the incident or event that causes the bodily injury must be accidental, *i.e.*, violent, sudden, unexpected, and external.  Thus, the critical foreseeability determination here is applied to the triggering event under the plain language of the SPD. Consequently, the Court does not find the decision in *Winchester* to be persuasive on this issue.

Plaintiff's next argument is actually in response to an argument advanced by CGLIC–that death from a heart attack, when the insured is performing his or her ordinary job duties, is a death from natural causes and not an accident. In support of this proposition, CGLIC cites *Howard v. National Education Association of New York,* 984 F.Supp. 103, 109 (N.D.N.Y. 1997) (holding "in the absence of any unexpected or unforeseen trauma, external force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident"; beneficiary failed to show that enormous stress at work for two years preceding death was a contributing factor in insured's fatal arrhythmia); *Haley v. American International Life Assurance Company of New York*, 789 F.Supp. 260, 264 (N.D.Ill. 1992) (rejecting argument that cold weather was a sufficient triggering event for fatal heart attack, because "[a]lthough it was a cold morning, it [was] not unexpected or unforeseeable for it to be that cold in Chicago on a December morning."); *Skowronek v. United Benefit Life Insurance Company,* 567 F.Supp. 63, 65 (E.D.Mich. 1983) (where insured, at time of his heart attack, was not performing abnormal or unusual work and nothing unexpected happened, court found death was from natural causes and not from an accident), *aff'd* 754 F.2d 167 (6th Cir. 1985); *Kolowski v. Metropolitan Life Insurance Company,* 35 F.Supp. 2d 1059, 1060 & 1063 (N.D.Ill. 1998) (finding insured's regular job duties as a police officer in narcotics division involved stress and physical exertion, and 18-hour work day which included a drug bust and heavy lifting of seized narcotics in cold weather several days before his heart attack,

did not constitute a departure from his regular/normal job activities to give rise to unforeseen/unexpected triggering event); *Riesterer,* 653 F.2d at 269 (fireman's death resulting from fatal heart attack while fighting fire inside a burning building was not accidental as he was not engaged in any abnormal or unusual job-related activities, taking into consideration the ordinary requirements of his job); and *Shiffler,* 838 F.2d at 85 n. 9 (suggesting, *in dicta*, that a heart attack that occurs as a result of job stress and tension from alleged harassment at work is likely not a product of violent, external and accidental means).

In response, Plaintiff argues that CGLIC's reliance on *Shiffler* is misplaced for several reasons: (1) *Shiffler* was decided under the arbitrary and capricious standard; (2) specific language existed in the policy defining accident using accidental means language and requiring a violent, external act, while no such language is present in Erbe's Policy; (3) federal and Pennsylvania common law no longer use the accidental means test; and, (4) there was no triggering event of the heart attack in *Shiffler*. With regard to the other cases relied on by CGLIC, Plaintiff contends these cases are distinguishable as they generally involved different policy language or applied presumptions that do not exist under Pennsylvania law, and/or involve different facts. For example, Plaintiff points out that the policy in *Riesterer* also contained an exclusion for illness/disease; in *Haley,* there was no triggering event, and the court suggested that cold weather may have been a triggering event had facts been presented to support it; the policy in *Kolowski* also contained an illness/disease exclusion, and the insured had a 20-year history of heart disease; in *Howard* the insured's doctors were unable to relate job stress as the triggering event of the heart attack.

Nonetheless, Plaintiff submits that the common thread running through the cases cited by CGLIC is the requirement that to be considered an accidental injury, a fatal heart attack must have

a triggering event.  Of particular significance to this case, Plaintiff posits that *Haley* and *Arthurs* suggest that a "triggering event" may consist of exposure to extreme environmental conditions either cold or hot.[34]  Thus, Plaintiff contends that even under the rule set forth in the cases cited by CGLIC, Mr. Erbe's heart attack was clearly brought on by a sufficient "triggering event," that is, his activities in the extreme environmental conditions existing on the date of his death.  Plaintiff offers the following facts in support of her argument:

- The temperature in the hot mill section of the steel plant hovered between 90 and 100 degrees during the inspection
- Mr. Erbe was required to wear a tight-fitting, plastic like suit over his regular clothing during the inspection
- Within minutes, Mr. Erbe was drenched in perspiration
- Mr. Erbe's younger co-worker testified that the 2 ½ to 3 ½ hour inspection left him exhausted and drained
- During the inspection, Mr. Erbe was required to walk up and down flights of stairs while inspecting 10 to 14 gear boxes
- Due to the extreme environmental conditions, Mr. Erbe and his co-worker were required to drink a Gatorade-type drink to keep their electrolytes up because of the profuse sweating
- Mr. Erbe worked primarily from home and his job duties included assisting salesmen in selling lubrication products; answering telephone inquiries, troubleshooting for and training other Exxon employees;  conducting various inspections at customers' facilities; and driving to and from jobs
- Shortly after completing the inspection, Mr. Erbe remarked that he was not feeling well and began to clutch his chest
- Approximately 15 to 20 minutes later, while driving home from the inspection, Mr. Erbe suffered cardiac arrest and died
- Dr. Wecht opined that Mr. Erbe's heart attack was triggered by the extreme environmental conditions coupled with the physical exertion in the hot mill

---

[34]Plaintiff also cites numerous state cases (none from Pennsylvania) finding death from a heart attack was accidental.  *See* Doc. No. 74 at 19-20 n.14.  CGLIC contends that these cases have no persuasive value for the proposition that a heart attack can be caused by accident.  Moreover, CGLIC argues that there are just as many state cases, if not more, that go the other way.

(Doc. No. 74 at 20-21.)  Based on the above factors, Plaintiff submits that the record establishes that Mr. Erbe's normal job did not routinely include extreme physical exertion in extreme environmental conditions, such as on the date of his death.  Consequently, Plaintiff maintains that because the extreme physical exertion and environmental conditions were both unusual and unforeseeable and triggered her husband's heart attack, Mr. Erbe's death resulted from an accident.

CGLIC responds that the cases cited by Plaintiff for the proposition that extreme heat or cold can be a "triggering event" constituting an accident that causes a heart attack do not support her position because these cases require that the extreme temperatures be completely unexpected or unforeseen.  In the case at bar, GCLIC submits the high temperatures in the hot mill section of a steel plant were neither unexpected nor unforeseen.  In addition, CGLIC maintains that the activities in which Mr. Erbe was engaged on July 21, 2003 were not unusual, but rather, were part of his regular job duties.  Thus, according to CGLIC, there was no unexpected or unforeseen "triggering event" in this case that could constitute an accident.  Instead, CGLIC argues that this Court should follow the approach taken in *Riesterer v. Crown Life Insurance Company,* 653 F.2d 268, 269-70 (6th Cir. 1981).

The Court agrees with Plaintiff's observation that the common thread running through the cases cited by CGLIC for determining whether a fatal heart attack resulted from an accidental bodily injury is the existence of a triggering event which was unusual or unexpected.  However, it is clear from the decisions applying this principle that the outcomes were quite fact specific.  When the Court applies the above principle to the facts of this case, it concludes that Plaintiff has failed to show that the physical exertion and extreme temperature in the hot mill were unusual or unexpected.  While *Haley* and *Arthurs* provide support for the proposition that extreme physical activity and

temperatures can be a triggering event of a heart attack, neither case provides factual support for the result sought here by Plaintiff.  For example, in *Haley*, the court rejected the beneficiary's argument that cold weather was the triggering event of the insured's heart attack because it found the weather conditions were not unexpected or unforeseen as it would normally be cold on a December morning in Chicago.  Likewise, in the case at bar, the extreme temperature in the hot mill section was not unexpected because it would normally be extremely hot in that type of plant.  In *Arthurs*, the court found material issues of fact existed precluding summary judgment on the issue of whether the insured's fatal heart attack was triggered by an extremely high temperature in the confined space of the vault where he was working, and that those conditions were not the usual conditions under which he was expected to work.[35]  760 F.Supp. at 1100-01.  It was unclear in *Arthurs* as to what the insured's normal job duties or work conditions consisted, and whether the temperature in the vault was known to be excessively hot.  Because these facts are lacking in *Arthurs,* that case does not support the result Mrs. Erbe seeks here.

In the case at bar, there is no evidence in the record as to how often Mr. Erbe conducted, or the percentage of time he devoted to conducting, inspections as part of his job duties.  However, evidence does exist that suggests that Mr. Erbe performed inspections as part of his regular job duties and that he previously performed inspections at a steel mill other than the one he inspected just prior to his death.  In particular, with regard to Mr. Erbe's duties for Exxon Mobil, Plaintiff testified:

---

[35]The insured collapsed after working for several hours in an enclosed Con Ed vault at the Port Authority Terminal in New York City where the temperature exceeded 110 degrees.  760 F.Supp. at 1096-97.  The medical examiner listed the cause of death as occlusive coronary arteriosclerosis.  The beneficiary's medical expert opined that strenuous work activities precipitated a sudden cardiac arrhythmia which proved fatal.  *Id.* at 1097.

Q.	What did Mr. Erbe do for Exxon Mobil?

A.	He was the senior lubrication engineer.

Q.	And to the best of your understanding, can you give us sort of an overview of what you understood his job duties to consist of?

A.	He would troubleshoot.  He went to an account.  He would tell them what kind of lubrications to use in various machinery.  He would also tell them if there was a problem that might have caused it.  He would do inspections in different–it depended on where he was when he did the inspections on and make recommendations.  He also supported whoever the field rep. was that was–like the marketing rep. that was selling the oil.  Ed's job was to support them and then he also trained new lubrication specialists and engineers how to go about doing the job.

Q.	And when you say he visited accounts, can you give us an idea of what kind of accounts or who you're talking about, if you know?

A.	I remember Armco Steel.  In Erie [he] had accounts.  He had a large number of accounts that were under his care.

Testimony of Karen Erbe dated 7/7/2004, Workers' Comp. Hrg. Tr. at 11-12 (R. 137-38). Also, the

record reflects that inspections were part of the regular job duties of a lubricating engineer, such as

Mr. Erbe.  In this regard, Mr. Erbe's co-worker, Greg Sadowski testified:

Q.	What is your position with Exxon Mobil?

A.	I'm now a lubrication engineer.

Q.	Is that the similar type position that Mr. Erbe held?

A.	Yes, it is.

Q.	Can you just for the record and for my benefit than anything else explain what you do as a lubrication engineer?

A.	I go out to different companies in the area and perform things like inspections, lube calls analysis for failures, off-highway equipment inspections.  Basically, looking at components seeing if they failed, why they failed, what we can do to prevent failures.  Similar to liability engineering.
	. . .

Q.	How often or how frequently would you work with Mr. Erbe in, say a given month?

A.	Several times.  I mean certainly we communicated on a daily basis but actually being in the field, several times a month.

45

Testimony of Greg Sadowski dated 8/30/2004, Workers' Comp. Hrg. Tr. at 4-5; 7-8 (R. 156-57;

159-60).  It can reasonable be inferred from Mr. Sadowski's testimony that when he was working

with Mr. Erbe in the field several times a month, they were conducting inspections at least part of

that time.

      With regard to the inspection at U.S. Steel's Mon Valley Works on July 21, 2003, Mr.

Sadowski testified:

> Q.    Let's talk about the inspection first.  You were inspecting what?
> A.    Gear boxes.
> Q.    Exactly what is that or generally what is that?
> A.    It's a big mill stand.  It got drives that turn the gears, like turn the rollers that the steel passes through.  So, it's a very large gear–a double Helical gear usually.  There's several gears in the stand–a pinion gear and a bull gear so we were inspecting those for changes from the year before.
>     . . .
>
> Q.    On the gear boxes where the inspection ports were at the top, you have to climb up onto the top of the gear box?
> A.    Yes.
> Q.    Did you do all of that or did Mr. Erbe do some of that?
> A.    I did.
> Q.    To the extent that there was physical labor involved in this activity, who did the physical labor?
> A.    I did.
>     . . .
>
> Judge:  How would [Mr. Erbe] do a final inspection on one that you had to climb to the top of?
> A.    The only time he would do a final inspection is if there was something that we just wanted to confirm.  So, I don't recall him having to get–there's only two–I think two gear boxes where you had to climb on top, and I don't recall him climbing on those two.  And the procedure would normally be, you know, I would inspect the gears, compare them to pictures from the previous year because this is a progressive thing.  We're looking to see how these gears are progressively wearing.  I would snap the photo of the gear

46

and then, you know, as I was inspecting, I would relay certain things to Ed who would write them down and then Ed always could also–he'd also look at the picture that I took.  So a lot of times, you know, there wasn't really anything for him to have to double check.  You know, if something looked really strange on the picture, then he would look into the gear box and just confirm that my findings were accurate.

Judge: So he did not necessarily even get up on to the stands that had the lookout on the side?

A.       Yeah.

Q.       But even though he may not have actually viewed the gears to any of the portals, was he still making the trip from gear box one to two to three et cetera?

A.       Yes.

*Id.* at 8-9; 43; 52-54 (R. 160-61; 195; 204-06).   Clearly, Mr. Sadowski's testimony establishes that Mr. Erbe had participated in previous inspections in the hot mill section of the U.S. Steel plant and that Mr. Erbe's physical activity during the inspection on July 21, 2003 was limited.   Based on this evidence, the Court concludes that Mr. Erbe's physical activity on the date of his death was not out of the ordinary or unusual, nor was it unexpected.  He had conducted inspections at the same steel plant in the past, as well as at another customer's facility, and therefore, the conditions on July 21, 2003 were reasonably foreseeable.

Moreover, inasmuch as the inspections took place at the customers' facilities, the work and environmental conditions would vary depending on the particular facility.  In the Court's opinion, this does not make the inspection on the date in question "unusual" or not part of Mr. Erbe's "routine" job duties, because his job duties, including inspections, routinely varied.  Thus, the Court concludes that the record does not support a finding that the triggering event, *i.e.,* Mr. Erbe's physical activities in the environmental conditions on the day of his death, were unusual or abnormal, and thus, unexpected.

The Court's conclusion is supported by *Riesterer.*  In that case, the insured suffered a heart

47

attack while performing his job as a firefighter, specifically, while attempting to put out a fire inside a burning building which was very hot and smoky. *Id.* at 269. The court noted that nothing in the record indicated that an external unusual event had occurred. *Id.* The cause of death listed on the death certificate read "myocardial infarction . . . over exertion in the line of duty while fighting a fire." *Id.* The doctor who prepared the death certificate testified that the insured's engagement in fighting a fire could have contributed to his heart attack. *Id.* The policy in *Riesterer* stated that double indemnity would be provided for accidental death where the insured "sustains any accidental bodily injury which, independent of all other causes, is the direct cause of any loss." *Id.* The policy also contained an exclusion "for any loss which is directly contributed to by, or is caused directly or indirectly by . . . illness or disease of any kind." *Id.* In determining whether the heart attack suffered by the insured constituted an accidental bodily injury causing death under the circumstances of the case, the court of appeals noted the presumption under Michigan law that heart attacks are a natural rather than accidental cause of death, but found that no Michigan case decided the precise issue before it.[36] *Id.* (citation omitted). Thus, the court of appeals turned to the decision of the Oregon Supreme Court in *Botts v. Hartford Accident & Indemnity Company*, 585 P.2d 657 (Or. 1978), a factually similar case, for guidance. In *Botts*, the supreme court upheld a directed verdict against a plaintiff whose decedent died of a heart attack while operating a highway grader. The attending physician in *Botts* testified that the heart attack had been caused, in part, by overexertion. According to the Oregon Supreme Court, the proper inquiry in cases of on-the-job heart attacks is "'whether the job-related activity leading to a victim's heart attack was abnormal and unusual,

---

[36]The court of appeals jurisdiction in *Riesterer* was predicated upon diversity jurisdiction. Since the case was commenced in the Eastern District of Michigan, the courts applied the law of the state of Michigan. 653 F.2d at 268.

taking into consideration the ordinary requirements of his job performance.'" *Riesterer,* 653 F.2d at 269 (quoting *Botts,* 585 P.2d at 661).  In both *Riesterer* and *Botts,* there was no evidence at the time of the heart attack either that the insureds were performing work that was at all "abnormal and unusual," or that the insureds were doing anything that their jobs did not frequently call upon them to do.  Thus, the *Riesterer* court affirmed the judgment of the district court which concluded that there was insufficient evidence that the insured's death was accidental.  Similarly, in the case at bar, the evidence shows that at the time of his heart attack, Mr. Erbe was performing an inspection that he was called upon to do on a regular basis as part of his job duties.

Also instructive is the district court's opinion in *Mers v. Marriott International Group Accidental Death & Dismemberment Plan,* 949 F.Supp. 1323 (N.D.Ill. 1996), *aff'd* 137 F.3d 510 (7th Cir.), *vacated & aff'd on reh'g* 144 F.3d 1014 (7th Cir. 1998)*,* where the court found that the insured's "death was accidental (as that term is commonly understood), as it was triggered by unusual physical activity and it was not, and, indeed, could not, reasonably have been foreseen or expected."[37] 949 F.Supp. at 1331.  In contrast to the case at bar, the insured in *Mers* did not engage in *any* physical activity as part of his job duties as the director of national accounts for a large hotel chain.  Rather, while attending a conference of professional managers, the insured participated in a Habitat for Humanity project, which involved strenuous physical activity, *i.e.,* using a sledge

---

[37]The term accident was not defined in the plan documents in *Mers*, and the district court, although acknowledging various approaches to defining accident, *i.e.,* accidental means–results, foreseeability, noted the Seventh Circuit's preference for defining accident in reference to the "common understanding."  949 F.Supp. at 1330.  The district court turned to its previous decision in *Haley,* for the common understanding of the term accident in the context of a fatal heart attack: "'As a general rule, in the absence of any unexpected or unforeseen trauma, external force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident.'" *Id.* at 1331 (quoting *Haley,* 789 F.Supp. at 263).

hammer and crow bar to tear down a plaster and lath wall, during which he suddenly collapsed. *Id.* at 1325-26. The insured died the next day and the cause of death was listed as cardiac arrest due to cerebral hemorrhage. *Id.* at 1326. A medical expert opined that increased vascular pressures due to unusual physical exertion at the Habitat project may have caused a previously weakened blood vessel–an aneurysm–to rupture, which would not have suddenly occurred had the insured continued his usual and customary lifestyle. *Id.*[38] Thus, unlike *Mers,* here the physical activity by Erbe was not unusual or abnormal, and thus not unexpected.

Finally, the Court finds that CGLIC's reliance on *Shiffler* is not entirely misplaced. Like the policy in *Shiffler,* here specific language exists in the plan documents defining accident, and where such language is provided, the Court is bound to apply it. Federal or Pennsylvania common law would apply only if no definition of accident was provided in the plan documents. Also, although not controlling because it is *dicta,* the court of appeals comment in *Shiffler* is instructive as it provides some guidance as to how that court might decide the issue if faced with that question, and it is entirely consistent with the conclusion reached here.

Accordingly, for all of the reasons set forth above, the Court concludes that Plaintiff has failed to show that Mr. Erbe's death resulted from a covered accident under the Policy.

### 4. Whether Mr. Erbe's Heart Attack Constitutes An Accidental Bodily Injury

CGLIC's denial of Plaintiff's claim for accidental death benefits should be upheld for another reason–because Plaintiff has failed to show that her husband's heart attack constitutes an

---

[38]Although the district court in *Mers* found the insured's death was accidental, it nonetheless upheld the denial of benefits because it also found that the medical evidence suggested that the insured's death did not result directly and independently from physical exertion, but rather was caused in large part by a pre-existing condition, infirmity or disease. *Id.* at 1333.

"injury" under the Policy.

Plaintiff argues that the injury here is an acute myocardial necrosis and infarction caused by an imbalance between the oxygen supply and the demand of the myocardium. Moreover, Plaintiff contends the Policy language, which provides that benefits will be paid when the insurer receives due proof of an "accidental bodily injury while insured for this benefit; and as a direct result of that injury, independent of all other causes, [the insured] died . . ." (R. 57), requires that the injury, independent of all other causes, caused the death. According to Plaintiff, this language does not refer to the nature of the accident or the relationship of the accident to the injury, but rather, refers to the connection between injury and death. Plaintiff thus contends that because Mr. Erbe's myocardial infarction injury proximately caused his death, she is entitled to benefits under the Policy.[39]

CGLIC responds that Plaintiff incorrectly reads the language of the Policy. Instead, CGLIC argues that the Policy requires an *accidental* bodily injury, independent of all other causes, that causes death. According to CGLIC, the reference in the Policy to "that injury" refers to the previous portion of the sentence which discusses "accidental bodily injury." Thus, CGLIC submits that Plaintiff's interpretation is contrary to the plain meaning of the sentence when read in its entirety.

Also, in support of its motion for summary judgment, CGLIC argues that a heart attack does not constitute a bodily injury because the definition of bodily injury requires external violence which

---

[39] Only if Plaintiff first proves that Mr. Erbe sustained an accidental bodily injury, does the Court reach the question of whether the accidental bodily injury, directly and independently of all other causes, caused Mr. Erbe's death. Plaintiff attempts to bypass her initial burden by arguing that the Policy requires the Court to focus on the connection between injury and death. This she cannot do.

is lacking here.  In this regard, CGLIC submits that Erbe's autopsy showed "no morphologic changes" in the heart.[40]  CGLIC further submits that the medical evidence shows that Mr. Erbe died of arteriosclerotic heart disease due to a failure to get sufficient oxygen as a result of the pre-existing blockage of his coronary arteries, and that under either the cited authority or the plan language, Mr. Erbe's heart attack does not constitute a bodily injury.  In support of its argument, CGLIC primarily relies on *Winchester* and *Riesterer.*

In opposition, Plaintiff responds that the holding in the cases cited by CGLIC is not in keeping with either federal or Pennsylvania common law.  Plaintiff submits that because "injury" is not defined in the Policy, it must be defined in accordance with the common understanding/usage.  In support, Plaintiff cites two Pennsylvania workers' compensation cases and a firemen's relief and pension fund case, in which the definition of "injury" did not require a finding of external violence, as well as *Pirkheim*, a federal district court case from Colorado.

In reply, CGLIC submits that the Pennsylvania cases cited by Plaintiff are not persuasive because the Policy here does not merely require an "injury," but rather, requires an "accidental bodily injury."  CGLIC notes that the Pennsylvania workers' compensation act was amended in 1972 to remove the "accident" requirement and to remove the prior definition of injury as "only violence to the physical structure of the body" in order to further the basic purposes of the statute of covering "all work-related harm to an employee."  *Pawlosky v. W.C.A.B.,* 525 A.2d 1204, 1208-09 (Pa. 1987).  Similarly, in *Creighan v. Firemen's Relief & Pension Fund Board,* the Pennsylvania Supreme Court, in interpreting the term injury under the fireman's relief law, noted the statutory

---

[40]"Morphologic" means "[o]f or relating to shape, form or structure."  OXFORD ENGLISH DICTIONARY ONLINE (2d ed. 1989), http://dictionary.oed.com (last visited Feb. 5, 2010).

purpose of providing broad coverage to all permanently disabled firemen.  155 A.2d 844, 847 (Pa. 1959).  In addition, CGLIC submits that the heart attack cases relied on by Plaintiff are distinguishable because they involved instances of damage to the body above and beyond the pre-existing condition.  For example, in *W.C.A.B. v. Bernard S. Pincus Company,* the supreme court found that the heart attack caused "damage" to the heart which constituted an injury.  388 A.2d 659, 664 (Pa. 1978).  Similarly in *Pirkheim,* the district court found that as a result of the accidental failure of his pacemaker, the insured suffered an injury through, *inter alia*, "pulmonary congestion and edema and a peritoneal effusion."  50 F.Supp.2d at 1025.  On the other hand, CGLIC posits that here Dr. Wecht reported that Mr. Erbe had pre-existing coronary arteriosclerosis, but that upon autopsy the heart "showed no morphological changes, either grossly or microscopically."  (R. 216.) In other words, there was no damage.  Thus, CGLIC posits that Mr. Erbe died from arteriosclerotic heart disease due to failure to get sufficient oxygen as a result of a pre-existing blockage of the coronary arteries.  According to CGLIC, this does not constitute an injury under any definition of "injury."

Although the Court concludes that the plain language of the Policy and SPD does not require physical impact or external violence to the insured in order for there to be an "injury," the Court nonetheless finds  that Plaintiff has failed to demonstrate that Mr. Erbe sustained an accidental bodily injury as required by the Policy.   It is clear from the plain language of the Policy which explains when an accidental death will be covered that the only reasonable interpretation of the phrase "that injury" in the second part of the sentence, is that it is referring to the term "accidental bodily injury" in the first part of the sentence.  Thus, Plaintiff must demonstrate that Mr. Erbe sustained an *accidental* bodily injury or, in other words, that Mr. Erbe's bodily injury was caused

by an accident.  In determining whether Plaintiff has satisfied her burden, the definition of "injury" as contained in the SPD is instructive.  "Injury" is defined in the SPD as "bodily injury caused directly and exclusively by a sudden, violent, unexpected, external accident."  (R. 43.)  Based on the medical evidence in the record, Plaintiff cannot prove that Mr. Erbe's alleged injury, an acute myocardial necrosis and infarction,[41] was caused *exclusively* by a sudden, violent, unexpected, external accident.  As discussed above, the external event that allegedly triggered Mr. Erbe's heart attack was his physical exertion during the inspection of the gear boxes in the hot mill section of a steel plant, where the temperature was estimated to be in excess of 90 degrees.  However, because the Court has already determined that this event was neither sudden nor unexpected, Plaintiff's myocardial ischemia cannot be accidental.  In addition, there is unrebuked medical  evidence in the record that Plaintiff's pre-existing arteriosclerotic cardiovascular disease was at least a partial cause of his death.[42]  Therefore, even if Plaintiff had sustained an accidental bodily injury,  Plaintiff cannot show that it was caused *exclusively* by a sudden, violent, unexpected, external  accident.

Contrary to CGLIC's assertion, the Court does not find *Winchester* persuasive on the

---

[41]It appears from the medical evidence that the cause of  Mr. Erbe's death was actually an acute myocardial ischemia due to insufficient blood flow through the atherosclerotic coronary arteries. (R. 218.)  "Ischemia" refers to an "deficient supply of blood to a body part (as the heart or brain) that is due to obstruction of the inflow of arterial blood (as by the narrowing of arteries by spasm or disease)."  MEDLINEPLUS (2009), http://www2.merriam-webster.com (last visited Feb. 12, 2010).  Dr. Wecht opined that Mr. Erbe's occluded coronary arteries could not provide the marked increase for oxygen demanded by the myocardium (heart muscle) that was produced by the extreme physical exertion, aggravated by a very hot environmental condition.  (R. 219.) Based on Dr. Wecht's report, it appears that the acute myocardial ischemia in this case was caused by pre-existing condition, *i.e.,* coronary artery disease.  The autopsy report, which lists the cause of death as arteriosclerotic cardiovascular disease, supports Dr. Wecht's conclusion. (R. 276-77.)

[42]*See* note 41, *supra.*

meaning of the term bodily injury.   In construing Utah law in an ERISA case, the court of appeals opined that in common usage, bodily injury denotes some sort of external violence or physical impact to the victim, and thus held heart failure by itself did not constitute a bodily injury under the policy. 975 F.2d at 1486 (citations omitted).[43]   In the case at bar, there is no requirement in either the Policy or the SPD definition of injury that there be some sort of external violence or physical impact to the victim.   This distinction is thus, dispositive.   Nonetheless, this Court finds the *Winchester* court's reasoning in reaching its conclusion to be instructive:

> The broad reading that the appellant would give to "bodily injury," that heart failure by itself is a bodily injury, would essentially read that term out of the policy altogether.   Death, being a physical phenomenon, will always be caused by some broad concept of bodily injury, such as heart attack, stroke, or internal organ failure.   If the phrase "bodily injury" were given such a broad interpretation in triggering death benefits, the phrase would really be superfluous, because death always and necessarily entails such bodily injury.   In such a case, an accidental death policy would be little different from a life insurance policy, save for any individual exclusions contained in each.   Typically, an accidental death policy is available for considerably lower premiums than a life insurance policy, and we should be chary about fundamentally remaking a policy to cover situations not intended actuarially.

*Id.* (internal citation omitted).

In the case at bar, Plaintiff urges the Court to adopt an interpretation of the term "bodily injury" that reads out the requirement of "accidental."   However, such a broad interpretation would essentially read the term "bodily injury" out of the Policy altogether because death, being a physical

---

[43] In *Winchester*, the insured participated in a firefighting training exercise at the electrical plant where he worked as part of his regular job duties, during which he wore a fireproof rubber suit. He collapsed shortly after the training exercise was completed and died of an apparent heart attack.  Because the beneficiary in that case failed to present any evidence of external violence or physical impact, the court of appeals held the insured's heart failure by itself did not indicate that he suffered a bodily injury within the meaning of the policy.  975 F.2d at 1486.

phenomenon, will always be caused by some broad concept of bodily injury, such as the myocardial ischemia in this case.  In addition, by merely requiring a "bodily injury" to trigger accidental death benefits under the Policy here, the phrase would be superfluous, and this accidental death Policy would, in essence, be converted to a life insurance policy, except for the exclusions.  Thus, these policy reasons, in addition to the plain language of the Policy, belie Plaintiff's argument.

Finally, the Court also finds no merit to Plaintiff's argument that the interpretation of the "injury" Policy language is supported by the requirement in the Policy that "the injury was one which would Warrant Workers' Compensation."  (Doc. No. 71 at 23 (quoting the Policy at 9 (R. 57)).)  Plaintiff contends that "injury" is not defined in the Policy and the only amplification or description of "injury" in the Policy is contained in that clause.  According to Plaintiff, because the drafter (CGLIC) used a worker's compensation requirement to modify the term "injury," that suggests the need to examine Pennsylvania workers' compensation cases defining the term "injury" and the manner of injuries warranting workers' compensation, in order to determine what constitutes an "injury" under the Policy here.

Plaintiff's argument completely misses the mark.  A close examination of the Policy reveals that the workers' compensation language referred to by Plaintiff appears under the second section of the accidental death benefits, entitled "Accidents Related to Work."  That section addresses whether a higher amount of death benefits is due if the death that results from accidental bodily injury is also work-related.  This section does not even come into play unless the beneficiary has first established that the insured died directly as a result of an accidental bodily injury, independent of all other causes, as required in the first section entitled, "Any Accident."  Because Plaintiff has failed to make this threshold showing, there is no need to address whether the injury was work-

related.  For purposes of establishing coverage under the Policy, the critical language is set forth in the "Any Accident" section, which describes the term "injury" as an "accidental bodily injury."  Since the Pennsylvania legislature amended the WCA in 1972 to eliminate the "accident" requirement in determining whether a worker sustained a work-related injury,[44] the post-amendment workers' compensation cases cited by Plaintiff are simply not dispositive on the issue of the definition of "injury."  Thus, Plaintiff's argument lacks merit.

Accordingly, for the reasons set forth above, the Court finds that Plaintiff has failed to show that Mr. Erbe suffered an accidental bodily injury under the Policy.

### 5.    Whether Mr. Erbe Died  As a Direct Result of an Accidental Bodily Injury, Independent of All Other Causes

The Policy also requires that Plaintiff prove that the insured's death resulted directly from an accidental bodily injury, *independent of all other causes*.  The parties devote considerable argument as to whether, assuming Mr. Erbe's death resulted from an accidental bodily injury, that injury caused his death independent of all other causes.  However, the Court declines to address this argument for two reasons.  First, the Court has already concluded that Plaintiff has failed to carry her burden of proving that Mr. Erbe suffered an "accident" as well as an "accidental bodily injury" as those terms are defined in the plan documents.  Failure to satisfy either of these requirements results in a denial of benefits.  Second, the court of appeals for this circuit has not spoken precisely on the issue presented here, and the courts of appeals to have decided the issue are not in complete

---

[44]*See* 1972 amendments to the Pennsylvania Workmen's Compensation Act, P.L. 159, No. 61, §6 (March 29, 1972) (amending Section 301 of Act 1915, codified at 77 PA.CONS.STAT.ANN. § 431, which read that: "compensation for personal injury to, or for the death of such employe, by an **[accident]** *injury* in the course of his employment, shall be paid in all cases by the employer, . . .").

agreement.[45]  Thus, because deciding this issue is unnecessary to the recommended outcome here, the Court refrains from predicting how the Court of Appeals for the Third Circuit would rule if given the opportunity.

## III.    CONCLUSION

The Court is not unsympathetic to Plaintiff's loss.  However, the Court is bound to apply the language of the Policy and SPD as written.  When the Court does so here, it is clear that Plaintiff has not shown that she is entitled to accidental death benefits under the Policy.  Therefore, CGLIC's denial of benefits should be affirmed.

For the reasons set forth above, it is recommended that Plaintiff's Motion for Summary Judgment (Doc. No. 69) be denied and that Defendant's Motion for Summary Judgment (Doc. No. 65) be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), FEDERAL RULE OF CIVIL PROCEDURE 72(b)(2), and Local Rule of Court 72.D.2., the parties are allowed fourteen (14) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

---

[45]*Compare Criss v. Hartford Accident & Indem. Co.*, 963 F.2d 373 (6th Cir.1992), *and Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008 (10th Cir.2000), *with Adkins v. Reliance Standard Life Ins. Co. of N. Am.*, 917 F.2d 794 (4th Cir.1990), *Dixon v. Life Ins. Co. of No. Am.*, 389 F.3d 1179 (11th Cir.2004), *and McClure v. Life Ins. Co. of No. Am.*, 84 F.3d 1129 (9th Cir.1996).

Dated:  February 17, 2010                    By the Court:

                                             _____
                                             LISA PUPO LENIHAN
                                             United States Magistrate Judge


cc:     All Counsel of Record
        *Via Electronic Mail*